# BOARD OF REGENTS OF STATE COLLEGES ET AL. *v.* ROTH

No. 71–162.   Argued January 18, 1972—Decided June 29, 1972

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 603. DOUGLAS, J., filed a dissenting opinion, *post*, p. 579. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS, J., joined, *post*, p. 604. MARSHALL, J., filed a dissenting opinion, *post*, p. 587. POWELL, J., took no part in the decision of the case.

*Charles A. Bleck,* Assistant Attorney General of Wisconsin, argued the cause for petitioners. With him on the brief were *Robert W. Warren,* Attorney General, and *Robert D. Martinson,* Assistant Attorney General.

*Steven H. Steinglass* argued the cause for respondent. With him on the brief were *Robert L. Reynolds, Jr., Richard Perry,* and *Richard M. Klein.*

Briefs of *amici curiae* urging reversal were filed by *Robert H. Quinn,* Attorney General, *Walter H. Mayo III,* Assistant Attorney General, and *Morris M. Goldings* for the Commonwealth of Massachusetts; by *Evelle J. Younger,* Attorney General of California, *Elizabeth Palmer,* Acting Assistant Attorney General, and *Donald B. Day,* Deputy Attorney General, for the Board of Trustees of the California State Colleges; by *J. Lee Rankin* and *Stanley Buchsbaum* for the City of New York; and by *Albert E. Jenner, Jr., Chester T. Kamin,* and *Richard T. Dunn* for the American Council on Education et al.

Briefs of *amici curiae* urging affirmance were filed by *David Rubin, Michael H. Gottesman, George H. Cohen,* and *Warren Burnett* for the National Education Association et al.; by *Herman I. Orentlicher* and *William W. Van Alstyne* for the American Association of University Professors; by *John Ligtenberg* and *Andrew J. Leahy* for the American Federation of Teachers; and by *Richard L. Cates* for the Wisconsin Education Association.

Mr. Justice Stewart delivered the opinion of the Court.

In 1968 the respondent, David Roth, was hired for his first teaching job as assistant professor of political science at Wisconsin State University-Oshkosh. He was hired for a fixed term of one academic year. The notice of his faculty appointment specified that his employment would begin on September 1, 1968, and would end on June 30, 1969.[1] The respondent completed that term. But he was informed that he would not be re-hired for the next academic year.

The respondent had no tenure rights to continued employment. Under Wisconsin statutory law a state university teacher can acquire tenure as a "permanent" employee only after four years of year-to-year employment. Having acquired tenure, a teacher is entitled to continued employment "during efficiency and good behavior." A relatively new teacher without tenure, however, is under Wisconsin law entitled to nothing beyond his one-year appointment.[2] There are no statu-

---

[1] The respondent had no contract of employment. Rather, his formal notice of appointment was the equivalent of an employment contract.

The notice of his appointment provided that: *"David F. Roth is hereby appointed to the faculty of the Wisconsin State University Position number 0262. (Location:) Oshkosh as (Rank:) Assistant Professor of (Department:) Political Science this (Date:) first day of (Month:) September (Year:) 1968."* The notice went on to specify that the respondent's "appointment basis" was for the "academic year." And it provided that "[r]egulations governing tenure are in accord with Chapter 37.31, Wisconsin Statutes. The employment of any staff member for an academic year shall not be for a term beyond June 30th of the fiscal year in which the appointment is made." See n. 2, *infra*.

[2] Wis. Stat. § 37.31 (1) (1967), in force at the time, provided in pertinent part that:

"All teachers in any state university shall initially be employed

tory or administrative standards defining eligibility for re-employment. State law thus clearly leaves the decision whether to rehire a nontenured teacher for another year to the unfettered discretion of university officials.

The procedural protection afforded a Wisconsin State University teacher before he is separated from the University corresponds to his job security. As a matter of statutory law, a tenured teacher cannot be "discharged except for cause upon written charges" and pursuant to certain procedures.[3] A nontenured teacher, similarly, is protected to some extent *during* his one-year term. Rules promulgated by the Board of Regents provide that a nontenured teacher "dismissed" before the end of the year may have some opportunity for review of the "dismissal." But the Rules provide no real protection for a nontenured teacher who simply is not re-employed for the next year. He must be informed by February 1 "concerning retention or non-retention for the ensuing year." But "no reason for non-retention need be given. No review or appeal is provided in such case."[4]

---

on probation. The employment shall be permanent, during efficiency and good behavior after 4 years of continuous service in the state university system as a teacher."

[3] Wis. Stat. § 37.31 (1) further provided that:

"No teacher who has become permanently employed as herein provided shall be discharged except for cause upon written charges. Within 30 days of receiving the written charges, such teacher may appeal the discharge by a written notice to the president of the board of regents of state colleges. The board shall cause the charges to be investigated, hear the case and provide such teacher with a written statement as to their decision."

[4] The Rules, promulgated by the Board of Regents in 1967, provide:

"RULE I—February first is established throughout the State University system as the deadline for written notification of non-tenured

In conformance with these Rules, the President of Wisconsin State University-Oshkosh informed the respondent before February 1, 1969, that he would not be rehired for the 1969–1970 academic year. He gave the respondent no reason for the decision and no opportunity to challenge it at any sort of hearing.

The respondent then brought this action in Federal District Court alleging that the decision not to rehire him for the next year infringed his Fourteenth Amendment rights. He attacked the decision both in substance and procedure. First, he alleged that the true reason for the decision was to punish him for certain statements critical of the University administration, and that it therefore violated his right to freedom of speech.[5]

faculty concerning retention or non-retention for the ensuing year. The President of each University shall give such notice each year on or before this date."

"RULE II—During the time a faculty member is on probation, no reason for non-retention need be given. No review or appeal is provided in such case.

"RULE III—'Dismissal' as opposed to 'Non-Retention' means termination of responsibilities during an academic year. When a non-tenure faculty member is dismissed he has no right under Wisconsin Statutes to a review of his case or to appeal. The President may, however, in his discretion, grant a request for a review within the institution, either by a faculty committee or by the President, or both. Any such review would be informal in nature and would be advisory only.

"RULE IV—When a non-tenure faculty member is dismissed he may request a review by or hearing before the Board of Regents. Each such request will be considered separately and the Board will, in its discretion, grant or deny same in each individual case."

[5] While the respondent alleged that he was not rehired because of his exercise of free speech, the petitioners insisted that the non-retention decision was based on other, constitutionally valid grounds. The District Court came to no conclusion whatever regarding the true reason for the University President's decision. "In the pres-

Second, he alleged that the failure of University officials to give him notice of any reason for nonretention and an opportunity for a hearing violated his right to procedural due process of law.

The District Court granted summary judgment for the respondent on the procedural issue, ordering the University officials to provide him with reasons and a hearing. 310 F. Supp. 972. The Court of Appeals, with one judge dissenting, affirmed this partial summary judgment. 446 F. 2d 806. We granted certiorari. 404 U. S. 909. The only question presented to us at this stage in the case is whether the respondent had a constitutional right to a statement of reasons and a hearing on the University's decision not to rehire him for another year.[6] We hold that he did not.

I

The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right

---

ent case," it stated, "it appears that a determination as to the actual bases of [the] decision must await amplification of the facts at trial. . . . Summary judgment is inappropriate." 310 F. Supp. 972, 982.

[6] The courts that have had to decide whether a nontenured public employee has a right to a statement of reasons or a hearing upon nonrenewal of his contract have come to varying conclusions. Some have held that neither procedural safeguard is required. *E. g., Orr* v. *Trinter,* 444 F. 2d 128 (CA6); *Jones* v. *Hopper,* 410 F. 2d 1323 (CA10); *Freeman* v. *Gould Special School District,* 405 F. 2d 1153 (CA8). At least one court has held that there is a right to a statement of reasons but not a hearing. *Drown* v. *Portsmouth School District,* 435 F. 2d 1182 (CA1). And another has held that both requirements depend on whether the employee has an "expectancy" of continued employment. *Ferguson* v. *Thomas,* 430 F. 2d 852, 856 (CA5).

to some kind of prior hearing is paramount.[7]   But the range of interests protected by procedural due process is not infinite.

The District Court decided that procedural due process guarantees apply in this case by assessing and balancing the weights of the particular interests involved.   It concluded that the respondent's interest in re-employment at Wisconsin State University-Oshkosh outweighed the University's interest in denying him re-employment summarily.   310 F. Supp., at 977–979. Undeniably, the respondent's re-employment prospects were of major concern to him—concern that we surely cannot say was insignificant.   And a weighing processs has long been a part of any determination of the *form* of hearing required in particular situations by procedural due process.[8]   But, to determine whether

---

[7] Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie* v. *Connecticut,* 401 U. S. 371, 379.   "While '[m]any controversies have raged about . . . the Due Process Clause,' . . . it is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate [a protected] interest . . . , it must afford 'notice and opportunity for hearing appropriate to the nature of the case' *before* the termination becomes effective." *Bell* v. *Burson,* 402 U. S. 535, 542.   For the rare and extraordinary situations in which we have held that deprivation of a protected interest need not be preceded by opportunity for some kind of hearing, see, *e. g., Central Union Trust Co.* v. *Garvan,* 254 U. S. 554, 566; *Phillips* v. *Commissioner,* 283 U. S. 589, 597; *Ewing* v. *Mytinger & Casselberry, Inc.,* 339 U. S. 594.

[8] "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie* v. *Connecticut, supra,* at 378.   See, *e. g., Goldberg* v. *Kelly,* 397 U. S. 254, 263; *Hannah* v. *Larche,* 363 U. S. 420.   The constitutional requirement

due process requirements apply in the first place, we must look not to the "weight" but to the *nature* of the interest at stake. See *Morrissey* v. *Brewer, ante,* at 481. We must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property.

"Liberty" and "property" are broad and majestic terms. They are among the "[g]reat [constitutional] concepts . . . purposely left to gather meaning from experience. . . . [T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged." *National Ins. Co.* v. *Tidewater Co.,* 337 U. S. 582, 646 (Frankfurter, J., dissenting). For that reason, the Court has fully and finally rejected the wooden distinction between "rights" and "privileges" that once seemed to govern the applicability of procedural due process rights.[9] The Court has also made clear that the property interests protected by

of opportunity for *some* form of hearing before deprivation of a protected interest, of course, does not depend upon such a narrow balancing process. See n. 7, *supra.*

[9] In a leading case decided many years ago, the Court of Appeals for the District of Columbia Circuit held that public employment in general was a "privilege," not a "right," and that procedural due process guarantees therefore were inapplicable. *Bailey* v. *Richardson,* 86 U. S. App. D. C. 248, 182 F. 2d 46, aff'd by an equally divided Court, 341 U. S. 918. The basis of this holding has been thoroughly undermined in the ensuing years. For, as MR. JUSTICE BLACKMUN wrote for the Court only last year, "this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'" *Graham* v. *Richardson,* 403 U. S. 365, 374. See, *e. g., Morrissey* v. *Brewer, ante,* at 482; *Bell* v. *Burson, supra,* at 539; *Goldberg* v. *Kelly, supra,* at 262; *Shapiro* v. *Thompson,* 394 U. S. 618, 627 n. 6; *Pickering* v. *Board of Education,* 391 U. S. 563, 568; *Sherbert* v. *Verner,* 374 U. S. 398, 404.

procedural due process extend well beyond actual ownership of real estate, chattels, or money.[10] By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process.[11]

Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries. For the words "liberty" and "property" in the Due Process Clause of the Fourteenth Amendment must be given some meaning.

## II

"While this Court has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska,* 262 U. S. 390, 399. In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed. See, *e. g., Bolling* v. *Sharpe,* 347 U. S. 497, 499–500; *Stanley* v. *Illinois,* 405 U. S. 645.

---

[10] See, *e. g., Connell* v. *Higginbotham,* 403 U. S. 207, 208; *Bell* v. *Burson, supra; Goldberg* v. *Kelly, supra.*

[11] "Although the Court has not assumed to define 'liberty' [in the Fifth Amendment's Due Process Clause] with any great precision, that term is not confined to mere freedom from bodily restraint." *Bolling* v. *Sharpe,* 347 U. S. 497, 499. See, *e. g., Stanley* v. *Illinois,* 405 U. S. 645.

There might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated. But this is not such a case.

The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dis-honesty, or immorality. Had it done so, this would be a different case. For "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin* v. *Constantineau*, 400 U. S. 433, 437. *Wieman* v. *Updegraff*, 344 U. S. 183, 191; *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123; *United States* v. *Lovett*, 328 U. S. 303, 316–317; *Peters* v. *Hobby*, 349 U. S. 331, 352 (DOUGLAS, J., concurring). See *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 898. In such a case, due process would accord an opportunity to refute the charge before University officials.[12] In the present case, however, there is no suggestion whatever that the respondent's "good name, reputation, honor, or integrity" is at stake.

Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would

---

[12] The purpose of such notice and hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons.

be a different case. For "[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury . . . ." *Joint Anti-Fascist Refugee Committee* v. *McGrath, supra,* at 185 (Jackson, J., concurring). See *Truax* v. *Raich,* 239 U. S. 33, 41. The Court has held, for example, that a State, in regulating eligibility for a type of professional employment, cannot foreclose a range of opportunities "in a manner . . . that contravene[s] . . . Due Process," *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 238, and, specifically, in a manner that denies the right to a full prior hearing. *Willner* v. *Committee on Character,* 373 U. S. 96, 103. See *Cafeteria Workers* v. *McElroy, supra,* at 898. In the present case, however, this principle does not come into play.[13]

To be sure, the respondent has alleged that the nonrenewal of his contract was based on his exercise of his right to freedom of speech. But this allegation is not now before us. The District Court stayed proceedings on this issue, and the respondent has yet to prove that

---

[13] The District Court made an *assumption* "that non-retention by one university or college creates concrete and practical difficulties for a professor in his subsequent academic career." 310 F. Supp., at 979. And the Court of Appeals based its affirmance of the summary judgment largely on the premise that "the substantial adverse effect non-retention is likely to have upon the career interests of an individual professor" amounts to a limitation on future employment opportunities sufficient to invoke procedural due process guarantees. 446 F. 2d, at 809. But even assuming, *arguendo,* that such a "substantial adverse effect" under these circumstances would constitute a state-imposed restriction on liberty, the record contains no support for these assumptions. There is no suggestion of how nonretention might affect the respondent's future employment prospects. Mere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of "liberty." Cf. *Schware* v. *Board of Bar Examiners,* 353 U. S. 232.

the decision not to rehire him was, in fact, based on his free speech activities.[14]

Hence, on the record before us, all that clearly appears is that the respondent was not rehired for one year at one university. It stretches the concept too far to suggest that a person is deprived of "liberty" when he simply is not rehired in one job but remains as free as before to seek another. *Cafeteria Workers* v. *McElroy, supra,* at 895–896.

---

[14] See n. 5, *supra.* The Court of Appeals, nonetheless, argued that opportunity for a hearing and a statement of reasons were required here "as a *prophylactic* against non-retention decisions improperly motivated by exercise of protected rights." 446 F. 2d, at 810 (emphasis supplied). While the Court of Appeals recognized the lack of a finding that the respondent's nonretention was based on exercise of the right of free speech, it felt that the respondent's interest in liberty was sufficiently implicated here because the decision not to rehire him was made "with a background of controversy and unwelcome expressions of opinion." *Ibid.*

When a State would directly impinge upon interests in free speech or free press, this Court has on occasion held that opportunity for a fair adversary hearing must precede the action, whether or not the speech or press interest is clearly protected under substantive First Amendment standards. Thus, we have required fair notice and opportunity for an adversary hearing before an injunction is issued against the holding of rallies and public meetings. *Carroll* v. *Princess Anne,* 393 U. S. 175. Similarly, we have indicated the necessity of procedural safeguards before a State makes a large-scale seizure of a person's allegedly obscene books, magazines, and so forth. *A Quantity of Books* v. *Kansas,* 378 U. S. 205; *Marcus* v. *Search Warrant,* 367 U. S. 717. See *Freedman* v. *Maryland,* 380 U. S. 51; *Bantam Books* v. *Sullivan,* 372 U. S. 58. See generally Monaghan, First Amendment "Due Process," 83 Harv. L. Rev. 518.

In the respondent's case, however, the State has not directly impinged upon interests in free speech or free press in any way comparable to a seizure of books or an injunction against meetings. Whatever may be a teacher's rights of free speech, the interest in holding a teaching job at a state university, *simpliciter,* is not itself a free speech interest.

## III

The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms.

Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. *Goldberg* v. *Kelly,* 397 U. S. 254.[15] See *Flemming* v. *Nestor,* 363 U. S. 603, 611. Similarly, in the area of public employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, *Slochower* v. *Board of Education,* 350 U. S. 551, and college professors and

---

[15] *Goldsmith* v. *Board of Tax Appeals,* 270 U. S. 117, is a related case. There, the petitioner was a lawyer who had been refused admission to practice before the Board of Tax Appeals. The Board had "published rules for admission of persons entitled to practice before it, by which attorneys at law admitted to courts of the United States and the States, and the District of Columbia, as well as certified public accountants duly qualified under the law of any State or the District, are made eligible. . . . The rules further provide that the Board may in its discretion deny admission to any applicant, or suspend or disbar any person after admission." *Id.,* at 119. The Board denied admission to the petitioner under its discretionary power, without a prior hearing and a statement of the reasons for the denial. Although this Court disposed of the case on other grounds, it stated, in an opinion by Mr. Chief Justice Taft, that the existence of the Board's eligibility rules gave the petitioner an interest and claim to practice before the Board to which procedural due process requirements applied. It said that the Board's discretionary power "must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process." *Id.,* at 123.

staff members dismissed during the terms of their contracts, *Wieman* v. *Updegraff,* 344 U. S. 183, have interests in continued employment that are safeguarded by due process. Only last year, the Court held that this principle "proscribing summary dismissal from public employment without hearing or inquiry required by due process" also applied to a teacher recently hired without tenure or a formal contract, but nonetheless with a clearly implied promise of continued employment. *Connell* v. *Higginbotham,* 403 U. S. 207, 208.

Certain attributes of "property" interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg* v. *Kelly,* *supra,* had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.

Just as the welfare recipients' "property" interest in welfare payments was created and defined by statutory terms, so the respondent's "property" interest in employment at Wisconsin State University-Oshkosh was created and defined by the terms of his appointment. Those terms secured his interest in employment up to June 30, 1969. But the important fact in this case is that they specifically provided that the respondent's employment was to terminate on June 30. They did not provide for contract renewal absent "sufficient cause." Indeed, they made no provision for renewal whatsoever.

Thus, the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it.[16] In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

## IV

Our analysis of the respondent's constitutional rights in this case in no way indicates a view that an opportunity for a hearing or a statement of reasons for nonretention would, or would not, be appropriate or wise in public

---

[16] To be sure, the respondent does suggest that most teachers hired on a year-to-year basis by Wisconsin State University-Oshkosh are, in fact, rehired. But the District Court has not found that there is anything approaching a "common law" of re-employment, see *Perry* v. *Sindermann, post,* at 602, so strong as to require University officials to give the respondent a statement of reasons and a hearing on their decision not to rehire him.

colleges and universities.[17]   For it is a written Constitution that we apply.   Our role is confined to interpretation of that Constitution.

We must conclude that the summary judgment for the respondent should not have been granted, since the respondent has not shown that he was deprived of liberty or property protected by the Fourteenth Amendment. The judgment of the Court of Appeals, accordingly, is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the decision of this case.

[For concurring opinion of MR. CHIEF JUSTICE BURGER, see *post,* p. 603.]

[For dissenting opinion of MR. JUSTICE BRENNAN, see *post,* p. 604.]

MR. JUSTICE DOUGLAS, dissenting.

Respondent Roth, like Sindermann in the companion case, had no tenure under Wisconsin law and, unlike Sindermann, he had had only one year of teaching at Wisconsin State University-Oshkosh—where during 1968–1969 he had been Assistant Professor of Political Science and International Studies.   Though Roth was rated by the faculty as an excellent teacher, he had publicly criticized the administration for suspending an entire group of 94 black students without determining individual guilt.   He also criticized the university's regime as being authoritarian and autocratic.   He used his classroom to discuss what was being done about the

---

[17] See, *e. g.,* Report of Committee A on Academic Freedom and Tenure, Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments, 56 AAUP Bulletin No. 1, p. 21 (Spring 1970).

black episode; and one day, instead of meeting his class, he went to the meeting of the Board of Regents.

In this case, as in *Sindermann,* an action was started in Federal District Court under 42 U. S. C. § 1983 [1] claiming in part that the decision of the school authorities not to rehire was in retaliation for his expression of opinion. The District Court, in partially granting Roth's motion for summary judgment, held that the Fourteenth Amendment required the university to give a hearing to teachers whose contracts were not to be renewed and to give reasons for its action. 310 F. Supp. 972, 983. The Court of Appeals affirmed. 446 F. 2d 806.

Professor Will Herberg, of Drew University, in writing of "academic freedom" recently said:

> "[I]t is sometimes conceived as a basic constitutional right guaranteed and protected under the First Amendment.
>
> "But, of course, this is not the case. Whereas a man's right to speak out on this or that may be guaranteed and protected, he can have no imaginable human or constitutional right to remain a member of a university faculty. Clearly, the right to academic freedom is an acquired one, yet an acquired right of such value to society that in the minds of many it has verged upon the constitutional." Washington Sunday Star, Jan. 23, 1972, B–3, col. 1.

---

[1] Section 1983 reads as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

There may not be a constitutional right to continued employment if private schools and colleges are involved. But Prof. Herberg's view is not correct when public schools move against faculty members. For the First Amendment, applicable to the States by reason of the Fourteenth Amendment, protects the individual against state action when it comes to freedom of speech and of press and the related freedoms guaranteed by the First Amendment; and the Fourteenth protects "liberty" and "property" as stated by the Court in *Sindermann.*

No more direct assault on academic freedom can be imagined than for the school authorities to be allowed to discharge a teacher because of his or her philosophical, political, or ideological beliefs. The same may well be true of private schools, if through the device of financing or other umbilical cords they become instrumentalities of the State. Mr. Justice Frankfurter stated the constitutional theory in *Sweezy* v. *New Hampshire,* 354 U. S. 234, 261–262 (concurring in result):

> "Progress in the natural sciences is not remotely confined to findings made in the laboratory. Insights into the mysteries of nature are born of hypothesis and speculation. The more so is this true in the pursuit of understanding in the groping endeavors of what are called the social sciences, the concern of which is man and society. The problems that are the respective preoccupations of anthropology, economics, law, psychology, sociology and related areas of scholarship are merely departmentalized dealing, by way of manageable division of analysis, with interpenetrating aspects of holistic perplexities. For society's good—if understanding be an essential need of society—inquiries into these problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered

as possible. Political power must abstain from intrusion into this activity of freedom, pursued in the interest of wise government and the people's well-being, except for reasons that are exigent and obviously compelling."

We repeated that warning in *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603:

"Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."

When a violation of First Amendment rights is alleged, the reasons for dismissal or for nonrenewal of an employment contract must be examined to see if the reasons given are only a cloak for activity or attitudes protected by the Constitution. A statutory analogy is present under the National Labor Relations Act, 29 U. S. C. § 151 *et seq.* While discharges of employees for "cause" are permissible (*Fibreboard Corp.* v. *NLRB,* 379 U. S. 203, 217), discharges because of an employee's union activities are banned by § 8 (a)(3), 29 U. S. C. § 158 (a)(3). So the search is to ascertain whether the stated ground was the real one or only a pretext. See *J. P. Stevens & Co.* v. *NLRB,* 380 F. 2d 292, 300.

In the case of teachers whose contracts are not renewed, tenure is not the critical issue. In the *Sweezy* case, the teacher, whose First Amendment rights we honored, had no tenure but was only a guest lecturer. In the *Keyishian* case, one of the petitioners (Keyishian himself) had only a "one-year-term contract" that was not renewed. 385 U. S., at 592. In *Shelton* v. *Tucker,* 364 U. S. 479, one of the petitioners was

a teacher whose "contract for the ensuing school year was not renewed" (*id.*, at 483) and two others who refused to comply were advised that it made "impossible their re-employment as teachers for the following school year." *Id.*, at 484. The oath required in *Keyishian* and the affidavit listing memberships required in *Shelton* were both, in our view, in violation of First Amendment rights. Those cases mean that conditioning renewal of a teacher's contract upon surrender of First Amendment rights is beyond the power of a State.

There is sometimes a conflict between a claim for First Amendment protection and the need for orderly administration of the school system, as we noted in *Pickering* v. *Board of Education,* 391 U. S. 563, 569. That is one reason why summary judgments in this class of cases are seldom appropriate. Another reason is that careful factfinding is often necessary to know whether the given reason for nonrenewal of a teacher's contract is the real reason or a feigned one.

It is said that since teaching in a public school is a privilege, the State can grant it or withhold it on conditions. We have, however, rejected that thesis in numerous cases, *e. g., Graham* v. *Richardson,* 403 U. S. 365, 374. See Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L. Rev. 1439 (1968). In *Hannegan* v. *Esquire, Inc.,* 327 U. S. 146, 156, we said that Congress may not by withdrawal of mailing privileges place limitations on freedom of speech which it could not do constitutionally if done directly. We said in *American Communications Assn.* v. *Douds,* 339 U. S. 382, 402, that freedom of speech was abridged when the only restraint on its exercise was withdrawal of the privilege to invoke the facilities of the National Labor Relations Board. In *Wieman* v. *Updegraff,* 344 U. S. 183, we held that an applicant could not be denied the opportunity

for public employment because he had exercised his First Amendment rights. And in *Speiser* v. *Randall,* 357 U. S. 513, we held that a denial of a tax exemption unless one gave up his First Amendment rights was an abridgment of Fourteenth Amendment rights.

As we held in *Speiser* v. *Randall, supra,* when a State proposes to deny a privilege to one who it alleges has engaged in unprotected speech, Due Process requires that the State bear the burden of proving that the speech was not protected. "[T]he 'protection of the individual against arbitrary action' . . . [is] the very essence of due process," *Slochower* v. *Board of Education,* 350 U. S. 551, 559, but where the State is allowed to act secretly behind closed doors and without any notice to those who are affected by its actions, there is no check against the possibility of such "arbitrary action."

Moreover, where "important interests" of the citizen are implicated (*Bell* v. *Burson,* 402 U. S. 535, 539) they are not to be denied or taken away without due process. *Ibid. Bell* v. *Burson* involved a driver's license. But also included are disqualification for unemployment compensation (*Sherbert* v. *Verner,* 374 U. S. 398), discharge from public employment (*Slochower* v. *Board of Education, supra*), denial of tax exemption (*Speiser* v. *Randall, supra*), and withdrawal of welfare benefits (*Goldberg* v. *Kelly,* 397 U. S. 254). And see *Wisconsin* v. *Constantineau,* 400 U. S. 433. We should now add that nonrenewal of a teacher's contract, whether or not he has tenure, is an entitlement of the same importance and dignity.

*Cafeteria Workers* v. *McElroy,* 367 U. S. 886, is not opposed. It held that a cook employed in a cafeteria in a military installation was not entitled to a hearing prior

to the withdrawal of her access to the facility. Her employer was prepared to employ her at another of its restaurants, the withdrawal was not likely to injure her reputation, and her employment opportunities elsewhere were not impaired. The Court held that the very limited individual interest in this one job did not outweigh the Government's authority over an important federal military establishment. Nonrenewal of a teacher's contract is tantamount in effect to a dismissal and the consequences may be enormous. Nonrenewal can be a blemish that turns into a permanent scar and effectively limits any chance the teacher has of being rehired as a teacher, at least in his State.

If this nonrenewal implicated the First Amendment, then Roth was deprived of constitutional rights because his employment was conditioned on a surrender of First Amendment rights; and, apart from the First Amendment, he was denied due process when he received no notice and hearing of the adverse action contemplated against him. Without a statement of the reasons for the discharge and an opportunity to rebut those reasons—both of which were refused by petitioners—there is no means short of a lawsuit to safeguard the right not to be discharged for the exercise of First Amendment guarantees.

The District Court held, 310 F. Supp., at 979–980:

> "Substantive constitutional protection for a university professor against non-retention in violation of his First Amendment rights or arbitrary non-retention is useless without procedural safeguards. I hold that minimal procedural due process includes a statement of the reasons why the university intends not to retain the professor, notice of a hearing at which he may respond to the stated reasons, and a hearing if the professor appears at the appointed

time and place. At such a hearing the professor must have a reasonable opportunity to submit evidence relevant to the stated reasons. The burden of going forward and the burden of proof rests with the professor. Only if he makes a reasonable showing that the stated reasons are wholly inappropriate as a basis for decision or that they are wholly without basis in fact would the university administration become obliged to show that the stated reasons are not inappropriate or that they have a basis in fact."

It was that procedure that the Court of Appeals approved. 446 F. 2d, at 809–810. The Court of Appeals also concluded that though the § 1983 action was pending in court, the court should stay its hand until the academic procedures had been completed.[2] As stated by the Court of Appeals in *Sindermann* v. *Perry*, 430 F. 2d 939 (CA5):

"School-constituted review bodies are the most appropriate forums for initially determining issues of this type, both for the convenience of the parties and in order to bring academic expertise to bear in resolving the nice issues of administrative discipline, teacher competence and school policy, which so frequently must be balanced in reaching a proper determination." *Id.*, at 944–945.

That is a permissible course for district courts to take, though it does not relieve them of the final determination

---

[2] Such a procedure would not be contrary to the well-settled rule that § 1983 actions do not require exhaustion of other remedies. See, *e. g., Wilwarding* v. *Swenson*, 404 U. S. 249 (1971); *Damico* v. *California*, 389 U. S. 416 (1967); *McNeese* v. *Board of Education*, 373 U. S. 668 (1963); *Monroe* v. *Pape*, 365 U. S. 167 (1961). One of the allegations in the complaint was that respondent was denied any effective state remedy, and the District Court's staying its hand thus furthered rather than thwarted the purposes of § 1983.

whether nonrenewal of the teacher's contract was in re-
taliation for the exercise of First Amendment rights or a
denial of due process.

Accordingly I would affirm the judgment of the Court
of Appeals.

MR. JUSTICE MARSHALL, dissenting.

Respondent was hired as an assistant professor of
political science at Wisconsin State University-Oshkosh
for the 1968–1969 academic year. During the course of
that year he was told that he would not be rehired for
the next academic term, but he was never told why.
In this case, he asserts that the Due Process Clause of
the Fourteenth Amendment to the United States Con-
stitution entitled him to a statement of reasons and a
hearing on the University's decision not to rehire him
for another year.[1] This claim was sustained by the
District Court, which granted respondent summary judg-
ment, 310 F. Supp. 972, and by the Court of Appeals
which affirmed the judgment of the District Court. 446
F. 2d 806. This Court today reverses the judgment of
the Court of Appeals and rejects respondent's claim.
I dissent.

While I agree with Part I of the Court's opinion, set-
ting forth the proper framework for consideration of the
issue presented, and also with those portions of Parts
II and III of the Court's opinion that assert that a
public employee is entitled to procedural due process
whenever a State stigmatizes him by denying employ-
ment, or injures his future employment prospects se-
verely, or whenever the State deprives him of a prop-

---

[1] Respondent has also alleged that the true reason for the decision
not to rehire him was to punish him for certain statements critical
of the University. As the Court points out, this issue is not before
us at the present time.

erty interest, I would go further than the Court does in defining the terms "liberty" and "property."

The prior decisions of this Court, discussed at length in the opinion of the Court, establish a principle that is as obvious as it is compelling—*i. e.,* federal and state governments and governmental agencies are restrained by the Constitution from acting arbitrarily with respect to employment opportunities that they either offer or control. Hence, it is now firmly established that whether or not a private employer is free to act capriciously or unreasonably with respect to employment practices, at least absent statutory [2] or contractual [3] controls, a government employer is different. The government may only act fairly and reasonably.

This Court has long maintained that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax* v. *Raich,* 239 U. S. 33, 41 (1915) (Hughes, J.). See also *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923). It has also established that the fact that an employee has no contract guaranteeing work for a specific future period does not mean that as the result of action by the government he may be "discharged at any time for any reason or for no reason." *Truax* v. *Raich, supra,* at 38.

In my view, every citizen who applies for a government job is entitled to it unless the government can establish some reason for denying the employment. This is the "property" right that I believe is protected by the Fourteenth Amendment and that cannot be denied "without due process of law." And it is also liberty—

---

[2] See, *e. g., Griggs* v. *Duke Power Co.,* 401 U. S. 424 (1971); 42 U. S. C. § 2000e.

[3] Cf. Note, Procedural "Due Process" in Union Disciplinary Proceedings, 57 Yale L. J. 1302 (1948).

liberty to work—which is the "very essence of the personal freedom and opportunity" secured by the Fourteenth Amendment.

This Court has often had occasion to note that the denial of public employment is a serious blow to any citizen. See, *e. g., Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 185 (1951) (Jackson, J., concurring); *United States* v. *Lovett,* 328 U. S. 303, 316–317 (1946). Thus, when an application for public employment is denied or the contract of a government employee is not renewed, the government must say why, for it is only when the reasons underlying government action are known that citizens feel secure and protected against arbitrary government action.

Employment is one of the greatest, if not the greatest, benefits that governments offer in modern-day life. When something as valuable as the opportunity to work is at stake, the government may not reward some citizens and not others without demonstrating that its actions are fair and equitable. And it is procedural due process that is our fundamental guarantee of fairness, our protection against arbitrary, capricious, and unreasonable government action.

MR. JUSTICE DOUGLAS has written that:

> "It is not without significance that most of the provisions of the Bill of Rights are procedural. It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law." *Joint Anti-Fascist Refugee Committee* v. *McGrath, supra,* at 179 (concurring opinion).

And Mr. Justice Frankfurter has said that "[t]he history of American freedom is, in no small measure, the

history of procedure." *Malinski* v. *New York,* 324 U. S. 401, 414 (1945) (separate opinion). With respect to occupations controlled by the government, one lower court has said that "[t]he public has the right to expect its officers . . . to make adjudications on the basis of merit. The first step toward insuring that these expectations are realized is to require adherence to the standards of due process; absolute and uncontrolled discretion invites abuse." *Hornsby* v. *Allen,* 326 F. 2d 605, 610 (CA5 1964).

We have often noted that procedural due process means many different things in the numerous contexts in which it applies. See, *e. g., Goldberg* v. *Kelly,* 397 U. S. 254 (1970); *Bell* v. *Burson,* 402 U. S. 535 (1971). Prior decisions have held that an applicant for admission to practice as an attorney before the United States Board of Tax Appeals may not be rejected without a statement of reasons and a chance for a hearing on disputed issues of fact; [4] that a tenured teacher could not be summarily dismissed without notice of the reasons and a hearing; [5] that an applicant for admission to a state bar could not be denied the opportunity to practice law without notice of the reasons for the rejection of his application and a hearing; [6] and even that a substitute teacher who had been employed only two months could not be dismissed merely because she refused to take a loyalty oath without an inquiry into the specific facts of her case and a hearing on those in dispute.[7] I would follow these cases and hold that respondent was denied due process when his contract was not renewed and he was not informed of the reasons and given an opportunity to respond.

---

[4] *Goldsmith* v. *Board of Tax Appeals,* 270 U. S. 117 (1926).

[5] *Slochower* v. *Board of Education,* 350 U. S. 551 (1956).

[6] *Willner* v. *Committee on Character,* 373 U. S. 96 (1963).

[7] *Connell* v. *Higginbotham,* 403 U. S. 207 (1971).

It may be argued that to provide procedural due process to all public employees or prospective employees would place an intolerable burden on the machinery of government. Cf. *Goldberg* v. *Kelly, supra.* The short answer to that argument is that it is not burdensome to give reasons when reasons exist. Whenever an application for employment is denied, an employee is discharged, or a decision not to rehire an employee is made, there should be some reason for the decision. It can scarcely be argued that government would be crippled by a requirement that the reason be communicated to the person most directly affected by the government's action.

Where there are numerous applicants for jobs, it is likely that few will choose to demand reasons for not being hired. But, if the demand for reasons is exceptionally great, summary procedures can be devised that would provide fair and adequate information to all persons. As long as the government has a good reason for its actions it need not fear disclosure. It is only where the government acts improperly that procedural due process is truly burdensome. And that is precisely when it is most necessary.

It might also be argued that to require a hearing and a statement of reasons is to require a useless act, because a government bent on denying employment to one or more persons will do so regardless of the procedural hurdles that are placed in its path. Perhaps this is so, but a requirement of procedural regularity at least renders arbitrary action more difficult. Moreover, proper procedures will surely eliminate some of the arbitrariness that results, not from malice, but from innocent error. "Experience teaches . . . that the affording of procedural safeguards, which by their nature serve to illuminate the underlying facts, in itself often operates to prevent erroneous decisions on the merits

from occurring." *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 366 (1963). When the government knows it may have to justify its decisions with sound reasons, its conduct is likely to be more cautious, careful, and correct.

Professor Gellhorn put the argument well:

"In my judgment, there is no basic division of interest between the citizenry on the one hand and officialdom on the other. Both should be interested equally in the quest for procedural safeguards. I echo the late Justice JACKSON in saying: 'Let it not be overlooked that due process of law is not for the sole benefit of an accused. It is the best insurance for the Government itself against those blunders which leave lasting stains on a system of justice'—blunders which are likely to occur when reasons need not be given and when the reasonableness and indeed legality of judgments need not be subjected to any appraisal other than one's own. . . ." Summary of Colloquy on Administrative Law, 6 J. Soc. Pub. Teachers of Law 70, 73 (1961).

Accordingly, I dissent.