**George DAVIS, Plaintiff,**

**v.**

**WINTERS INDEPENDENT SCHOOL DISTRICT, a political subdivision of the State of Texas, its Trustees, Administrators and Employees, J. W. Bahlman et al., Defendants.**

**Civ. A. No. 6–315.**

United States District Court,
N. D. Texas,
San Angelo Division.

June 4, 1973.

Larry Watts, Walker, Strahan, Brunson & Watts, Houston, Tex., for plaintiff.

Donald W. Griffis, Griffis & Griffis, San Angelo, Tex., for defendants.

WOODWARD, District Judge.

The above entitled and numbered cause came on to be heard by the Court, without the intervention of a jury, in San Angelo, Texas, on the 17th and 18th days of May, 1973, and each party announced ready for trial and presented to the Court the evidence and argument of counsel. After consideration of all the evidence presented to the Court, the argument and briefs of counsel, and all of the pleadings on file herein, the Court files this Memorandum Opinion which shall constitute the Court's Findings of Fact and Conclusions of Law.

The plaintiff, George Davis, brought suit against the above named defendants, individually and in their official capacity, alleging a cause of action under 42 U.S.C. § 1983. He particularly alleges deprivation of certain rights guaranteed him by the First and Fourteenth Amendments of the United States Constitution. Jurisdiction in the Court is vested under 28 U.S.C. §§ 1331, 1343.

Except for minor details, the essential facts necessary to the entry of judgment in this case are not materially contradicted by the testimony of any of the witnesses, although the conclusions to be drawn from these facts are sharply in dispute.

In August of 1964, the plaintiff, George Davis, was employed by the Winters Independent School District and that year taught subjects in the seventh grade plus coaching in the sixth, seventh, and eighth grades. He had previously graduated from North Texas State University in 1964, and a certificate from the Commissioner of Education for the State of Texas certified that he had completed all legal requirements for the Texas Teacher's Certificate, with the area of specialization being high school, and he was certified in the area of social studies. This certificate entitled him to teach social studies in the seventh and eighth grades.

Although the State of Texas has a continuing contract law available for use by school districts in the State of Texas, such use is permissive, and the Winters Independent School District has never adopted or elected to use the continuing contract method of employment of its classroom teachers. Rather, each classroom teacher was employed by the Winters District for a one-year term commencing in August and ending the following May, the salary being payable in twelve monthly payments. The plaintiff was employed under such a contract for each and every year that he taught at Winters.

The Winters Independent School District consists of two campuses, across the street from each other, one being the high school of grades nine through twelve and the other being the grade school of grades kindergarten through

eight. The plaintiff taught in the elementary school and on that campus, in addition to driving a bus.

Grades kindergarten through five were contained classrooms, that is one teacher taught all subjects to a particular section of each of these grades. Grades six, seven and eight were organized in a different fashion in that different teachers would teach different sections of these grades separately. That is one teacher would teach social studies, another math, English, and so on, although many of the teachers were qualified to teach in more than one area and some of them did.

The plaintiff was employed by the Winters School District as a classroom teacher from the summer of 1964 through May of 1971—his contract was not renewed for the 1971–72 school year.

In the late fall of 1970 and the first part of the year 1971 the superintendent of this district, defendant Carroll E. Tatom, became aware that declining enrollment of students in this school district during that school year would probably necessitate the reduction in the number of classroom teachers from 27 to perhaps as low as 24 in the grades of kindergarten through grade eight. The declining enrollment had been present for many years as the average daily attendance in this school district had dropped from 724 in grades one through eight in 1966–67 to 697 in 1967–68, to 685 in 1968–69, to 659 in 1969–70, to 627 in 1970–71 (and in this year the kindergarten attendance of 25 was included showing a loss to 602 in grades one through eight), and to 590 in 1971–72 with the kindergarten included. There had been reductions in the number of classroom teachers for these grades throughout these years, but it had never been necessary to non-renew a teacher's contract in order to reduce the classroom teacher force as normal resignations and retirements took care of the situation. However, it became apparent to Superintendent Tatom during the 1970–71 school year that he would not be able to

finance, from funds received from the State of Texas, the 27 classroom teachers then employed in grades kindergarten through eight in the next school year of 1971–72. The record shows that during the following school year of 1971–72 there were 25 classroom teachers employed in grades kindergarten through eight. The evidence shows that there had not been a drastic reduction in the average daily attendance in the high school from 1966–67 through 1971–72. Such attendance in high school in the 1966–67 school year was 300 and in 1971–72 it was 290 with 22 classroom teachers still being employed in 1971–72 as the case was in 1966–67.

In the last part of 1970 or the early part of 1971, Superintendent Tatom, realizing that he was faced with a reduction in the number of classroom teachers that he could employ in the elementary school, advised the teachers as a body of this possibility and urged those who intended to resign or retire to advise him as quickly as possible in order that he could plan accordingly as he wished to advise any teacher who might not have his contract renewed of this fact as quickly as possible.

The analysis made by Superintendent Tatom indicated to him that the critical areas, where reduction in teachers would need to be made, would be in grade one, grade four, and in grades six through eight. It was in this last category that the plaintiff was teaching during the school year of 1970–71, and at such time he was teaching social studies and had been assigned six sections to teach that year in this area.

Mr. Tatom reduced to writing the results of his studies and determined that at least one teacher would not have his or her contract renewed for the following school year. His analysis of the data that he had collected showed that the plaintiff was certified to teach only in social studies. At that time there were seven teachers who were qualified to teach social studies in the elementary school, and all of them, with the excep-

tion of the plaintiff, George Davis, were certified to teach in more than one area. In other words, the other seven who could teach social studies were also certified to teach math or other different categories of subjects. Therefore, attention was focused on Mr. Davis as the candidate for non-renewal.

In early February of 1971, the superintendent went to the principal's office at the elementary school and called Mr. Davis in for a conference. At such time, the plaintiff had explained to him the findings and conclusions of Mr. Tatom and was told at that time that he might be the teacher that would not have his contract renewed. It was explained to him that the reason for this reduction was caused by the decrease in enrollment in the Winters Independent School District, and in particular the elementary grades, and that the reason that he was being designated as the teacher in particular to not have his contract renewed was that he was the only one of the teachers that was not qualified to teach in more than one subject.

Although the superintendent told the plaintiff only that he might be the one selected at this meeting, which was held on or about February 12, 1971, the plaintiff did meet the superintendent in the halls the following day and informed the superintendent that he understood that a Mrs. Mathis was going to take her retirement and that he should be able to fill her vacancy since she taught social studies. However, the superintendent informed him that this would not be possible because Mrs. Mathis in addition to being qualified to teach social studies was also qualified in math. In fact a teacher qualified in mathematics was hired to succeed her. The plaintiff testified that at that time he realized that his situation was almost hopeless and knew that he would be the one selected to be dropped from the roll of teachers.

Realizing that he had been informed by the superintendent of the schools that his contract would not be renewed because of these reasons, Mr. Davis took it upon himself to visit with all but one of the school board members, soliciting their support for the renewal of his contract for the following year. None of them gave him any promise other than that they would give his problem due consideration. Shortly before the Board of Trustees' meeting on March 9, 1971, which was the customary date of the meeting to vote on the teachers to be awarded contracts for the coming school year, Mr. Davis asked the superintendent for permission to appear before the board. Such permission was granted and Mr. Davis, accompanied by his wife, appeared before the Board of Trustees at its meeting on March 9, 1971, and was allowed to speak and state anything that he wished to state with respect to his position. No questions were asked nor did he inquire of any members of the board at this meeting, and Mr. and Mrs. Davis then left. Later in the meeting, the Board of Trustees voted, after full discussion, on the contracts to be renewed for the following year, and Mr. Davis' contract was not renewed.

Mr. Davis is now asserting in this suit that he has been deprived of his constitutional rights, when his contract was not renewed, because there was a de facto tenure system in existence in the Winters School District at such time; that his non-renewal came about because of his activities in the local classroom teachers' association; that the defendants acted arbitrarily and capriciously in not renewing his contract because of such activities and because he had at one time meted out punishment to the son of the superintendent and on another occasion to a niece of one of the school board members. The defendants' position is that Mr. Davis was not fired nor was he terminated, but that he was fully paid for the contract for the school year in which he was employed, and that he was simply not given another contract; that his contract was not renewed solely for the reason that there was a declining enrollment and a decline in the average daily attendance in the

school district that necessitated a reduction in the classroom teachers and that the selection of Mr. Davis was determined solely by the fact that he, out of all the other teachers in the critical areas, was the only one that was not certified to teach in more than one category. It is admitted by defendants that other teachers had their contract renewed that year who were junior in service to Mr. Davis, and further that, due to some deaths and resignations after his contract was not renewed in March of 1971, other teachers were employed by the school district. However, Mr. Tatom states that those employed had certifications in subjects that were needed by the school district and in which Mr. Davis was not certified to teach.

The record does show that Mr. Davis at one time did administer corporal punishment to the superintendent's son and that shortly thereafter the superintendent complained to Mr. Davis. It developed that in administering the whipping the boy had been bruised on his legs, which was a violation of policy. The evidence also showed that another teacher had administered similar punishment to this same boy, but that his contract was renewed, and this Court finds that this was not the reason for the non-renewal of plaintiff's contract.

It was also uncontested that Mr. Davis disciplined a niece of one of the school board members and that her parents had complained that his handling of the girl was improper. As the result of this complaint a conference was held between Mr. Davis, the superintendent, the principal, and the parents of the young lady. This was a very heated discussion with these parents physically threatening Mr. Davis during the conference, but after the young lady was called in for further conference, the matter was settled. The member of the school board, the uncle of the young lady in question, stated under oath that at the time he voted on the renewal of contracts in March of 1971 he was not even aware of this incident.

The evidence is also uncontradicted that Mr. Davis visited school board meetings in January and February of 1971, principally to talk to the school board about its policy concerning the Professional Growth policies for the classroom teachers, which required teachers to gain credit in workshops or institutions of higher learning during the summer months which was inconvenient because of the date of the commencement of classes in the fall at Winters.

However, after examining all of the evidence and considering very carefully the contentions of the plaintiff, the Court finds that the sole reason that the contract of Mr. Davis was not renewed for the 1971–72 school year was because of the declining average daily attendance in the Winters Independent School District and the fact that Mr. Davis was the most logical one to be selected because of his certification in only one field of teaching.

In Plaintiff's Exhibit 2, on page 16, appears the title RENEWAL OF CONTRACTS. This is the policy that was adopted by the Winters District in October of 1968 and was in effect at the time in question here. At the bottom of this page begins a heading TERMINATION OF CONTRACTS, which deals with the termination of a teacher's contract prior to the end of any school year or prior to the end of the contractual period, but such is not the case here. The plaintiff has been paid in full for the school year for which he had a contract and it is only that this contract was non-renewed that forms the basis for his alleged damages in this case. The Court finds that the Winters Independent School District and each defendant complied with the procedures pertaining to renewal of contracts as set forth in this exhibit. The plaintiff was notified in early February that his reelection was in doubt, he was given the reasons therefor and had his conference at such time with the superintendent and principal. The difficulty of course was that of declining enrollment and this situa-

tion had not been corrected nor had there been sufficient resignations or retirements by the March board meeting that would have corrected this problem, and accordingly the school board did not renew his contract. A meeting in April, as contemplated by this policy, does not apply to this fact situation as it would have been futile—the enrollment had not increased nor does the evidence show that any vacancy existed in April in a position in which plaintiff was qualified to teach.

 The Court is of the opinion that the defendants, having followed their own policy and procedures in this regard, afforded to the plaintiff each and every one of the rights that he had under the law or by virtue of this policy. There is no constitutional right that a teacher has for renewal of a one-year contract when the non-renewal is for the reasons and under the facts of this case.

The facts further show that the plaintiff made applications to various neighboring school districts for employment but to date has not been employed by any of them. However the Court does find as a matter of fact that he applied to the Novice Independent School District, and that he was afforded an opportunity to go before the board and that the plaintiff even testified that he was "positive" that he could have gotten the job, but because of various circumstances he decided not to appear before the board. This is an indication that nothing was done by the Winters Independent School District to reflect on his professional reputation or moral character to such an extent that would make him unemployable in this area.

The outcome of this case is determined by Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). There the Court positively held that the requirements of procedural due process apply only to the deprivation of rights under the Fourteenth Amendment's protection of liberty and property and the First Amendment's free speech protection (p. 569, 92 S.Ct. 2701). The plaintiff in this case has not been deprived of any of his rights as to liberty, property or freedom of speech as afforded by the Constitution.

There is no evidence or allegation of any bodily restraint; the right of this plaintiff to contract with anyone else has not in any way been restricted; he is still fully able to engage in the occupation of teaching or any other occupation; he has the right to acquire additional knowledge to further his education should he desire; the right to continue his marriage and his home, which he built himself, and to bring up his children and to worship God and the full freedom of speech are all unabridged by the actions of defendants. There were no charges brought against this plaintiff by defendants that would affect any of the above rights or deprive him of any of the above rights and there has never been any intimation that his contract was not renewed because of dishonesty, immorality, reputation, honor, or integrity, and in fact it was established by the uncontradicted evidence of all witnesses that his competency and efficiency as a teacher were not in question. There was no stigma imposed by the action of the board in not renewing his contract that foreclosed in any way his freedom to take advantage of other employment opportunities, nor were such opportunities restricted in any way, and the Court specifically has found above that his activities as a member of the classroom teachers' association in Winters did not have anything to do with the non-renewal of his contract, nor were his activities in the field of speech in any way the cause of such non-renewal. It might be well to note here that the day after the board failed to renew his contract, the plaintiff circulated a statement somewhat ridiculing the activities of the board, but this could not have affected the board's decision not to renew his contract as it was an activity on plaintiff's part after the failure of the board to award him another year's contract.

■ Further, this Court does not find that there has been any implied promise of continued employment to this plaintiff or to any other teacher in the Winters Independent School District. It is a fact that for at least the past ten years or more George Davis, the plaintiff herein, is the only classroom teacher that did not have his contract renewed for the following school year. However, none of the teachers felt that they had any right to reemployment for the subsequent years and the plaintiff even testified that during the period surrounding the school board meetings in March of each year (when the contracts came up for renewal), that each teacher was somewhat apprehensive or even afraid of the action that would be taken on their contract. This indicates that none of the teachers expected or had ever received any promise, express or implied, that they were being employed for more than one year. This does not amount to a de facto tenure policy. The Winters Independent School District has specifically refrained from adopting the continuing contract law, and even though it has not been required to drop teachers by non-renewal in past years, it was clearly understood by everyone involved that no teacher was employed except for one school year and that each teacher was subject to renewal or non-renewal in March of each year by the school board, and each teacher, including Mr. Davis, was aware of this policy and understood that it was applicable to each and every classroom teacher in the school district.

The Court does not find, that by his contract of employment, there was any express or even implied right vested in George Davis with respect to any reemployment or renewal for a subsequent year. Of course he did have a concern and interest in being rehired, but this is different from a property interest which would give him a right or entitlement to a renewal of his contract. Board of Regents v. Roth, *supra.*

There being no deprivation of any of plaintiff's rights to liberty or property under the Constitution of the United States by these defendants under these facts, and there being no actual or de facto tenure policy or continuing contract policy by the Winters Independent School District, the defendants cannot be held liable under 42 U.S.C. § 1983 and plaintiff must be denied any recovery on his complaint.

■ Even though these facts might be held to constitute a sufficient deprivation of plaintiff's rights of liberty or property, or even if there was a de facto tenure policy, the Court finds that the procedures followed in this case were sufficient to afford plaintiff all due process procedural rights. He was given a conference, explained the reasons for the action to be taken, all well in advance of the action itself, was afforded an opportunity to appear before the school board, say anything he wanted to and present any argument that he desired without restriction, and even visited with the school board members personally. Having done so and having been afforded these rights, it cannot be said that any of the parties involved acted in any manner except in good faith. The defendants' acts and conduct were not arbitrary nor capricious, but the defendants afforded plaintiff all of his constitutional rights including due process and he was not deprived of any constitutional rights by defendants.

The Court has previously ordered that the trial of this case be bifurcated so that the trial on the issues of liability would be, first and separately, held, and if finally determined in favor of the plaintiff, then a second trial and hearing would be held on damages. In view of the above no such second trial is necessary.

Judgment will accordingly be entered for and on behalf of the defendants denying the plaintiff all relief.

All costs are to be taxed against plaintiff.