OPINION OF THE COURT
Richard Lee Price, J.
THE UNCONTROVERTED FACTS
The petitioner was duly appointed a New York City marshal on August 13, 1958. On October 24, 1979, petitioner was suspended from his office pursuant to a joint order of the Appellate Division charging petitioner and 10 other marshals with various crimes relating to their offices. The joint order sought to suspend the marshals pending disposition of the criminal proceedings. (This joint order was subsequently overturned by the United States District Court.)
On November 7,1980, petitioner was sentenced upon his conviction for the crimes charged. Contemporaneously therewith, petitioner’s tenure of office was terminated, *914 pursuant to the vacatur provided under section 30 of the Public Officers Law.[1]
Although it is unclear from the papers submitted, the petitioner apparently became “re-employed” by a city marshal’s office sometime after his removal as a city marshal. The nature of petitioner’s employment is disputed.
On July 2, 1981, the Department of Investigation, by signature of Stanley Lupkin, then commissioner of the department, issued appendix (directive) Q-104, which addressed the issue of employment of former city marshals.
The directive reads, in pertinent part: “any former Marshal who has been convicted of a crime related to the performance of his/her official duties may not be employed by any present City Marshal when such employment bears a direct relationship to the criminal offense for which the former marshal was convicted”.
Thereafter, on August 25, 1981, a meeting was held by the respondents to discuss the continued employment of the petitioner. On August 31, 1981, the petitioner’s employer, City Marshal Jacob Ribotsky (petitioner’s father) received notification that petitioner’s employment must be terminated.[2]
petitioner’s controverted factual allegations
Petitioner alleges that the offenses underlying his removal from office and criminal conviction resulted from certain “sham auctions” conductéd “away from the office” by petitioner and others. No further elucidation is offered by petitioner regarding the nature of the offenses.
*915 Petitioner also alleges that the activities he performed at the city marshal’s office after his removal as a city marshal were of a “menial clerical” character. The petitioner describes these duties in the following manner: “the clerical duties * * * included such office functions as answering the telephone, filing papers, opening the mail and posting entires [sic] in the firm’s ledgers.”
The petitioner alleges further that at the meeting of August 31, 1981, respondent Litwack maintained that petitioner “would be permitted to sweep the floors and clean the windows with a reservation that in sweeping the floors (the petitioner’s) eyes would not have occasion to read a scrap of paper that may have fallen to the floor”.
respondents’ controverted factual allegations
The respondents allege that the petitioner was convicted “for violating Title 18, U.S.C. §§ 1962(c), 1962(d), 1951, 1341 and 2 in that he did knowingly, willfully and unlawfully combine, conspire, confederate and agree with others to conduct and participate, directly and indirectly, in the conduct of the affairs of the Civil Court of the City of New York, through a pattern of racketeering activity, to devise a scheme to defraud and for obtaining money and property by means of false and fraudulent pretenses, did cause to be delivered by mail payments to attorneys for judgment creditors, representing less than full amounts which had been received at sham public auction sales and engaged in activities affecting interstate commerce.”
Furthermore, respondents allege that while petitioner’s employment after removal might be loosely characterized as “clerical”, his duties went beyond that nominal classification: “the petitioner, who was making $750.00 per week, was filing papers for the marshal, answering the marshal’s telephones, opening the marshal’s mail and making entries into the marshal’s official books and records. The petitioner, in filing Civil Court mandates, was therefore directly involved in the affairs of the Civil Court. The petitioner answered telephone calls dealing with questions regarding not only the service of process emanating from the Civil Court but the scheduling of auctions of property to satisfy Civil Court judgments. The petitioner was opening mail which contained cash to satisfy Civil Court judg *916 ments. The petitioner was entering information regarding auction sales and other Civil Court process and the receipt of money into the official records of an enforcement officer of the Civil Court.”
Respondents maintain the following with respect to the employability of petitioner within City Marshal Ribotsky’s office: “It was explained that if there were other functions that the Marshal would like his son to perform he should first check with this Department to see if they were proscribed by the Directive.”
This statement was contained in a personnel memo written by respondent Kenneth Litwack following the August 25, 1981 meeting.
petitioner’s asserted bases for relief
Petitioner now brings on this CPLR article 78 proceeding to compel respondents to vacate their determination prohibiting the petitioner from “procuring employment with the office of a City Marshal”.
Petitioner attacks this determination on several levels:
(1) Directive Q-104 is obviously based on section 752 of the Correction Law and therefore is inapplicable to petitioner because the office of the city marshal is not a “public agency” as required for coverage by that statute.
(2) The authority given to the Department of Investigation pursuant to joint order 453 pertains solely to daily activities and conduct of city marshals and does not include the power to set hiring and firing guidelines.
(3) Issuance of directive Q-104 was arbitrary and capricious and particularly aimed at punishing petitioner.
(4) The directive violates the United States Constitution in that it
(A) violates the equal protection clause, and
(B) constitutes a bill of attainder and ex post facto decree in violation of sections 9 and 10 of article I.
(5) The directive violates the Human Rights Law of the State of New York.
(6) The directive violates the spirit and concept of section 752 of the Correction Law.
*917 (7) The directive violates the spirit and intent of section 1983 of title 42 of the United States Code and title 7 of the Civil Rights Act of 1964 (78 US Stat 241, 253).
(8) The directive has been applied arbitrarily and capriciously to the petitioner.
The above constitutes petitioner’s formal objections to the activities engaged in by the respondents vis-a-vis the petitioner. All these objections, however, boil down to two primary accusations:
(1) The very issuance of directive Q-104 is unfair (or violates a United States or State Constitution or statute) because it treats convicted ex-city marshals differently than convicted felons in general.
(2) The application of the directive to petitioner is unreasonable (or in contravention of the spirit and intent of various statutes) in that the duties performed by the petitioner at the time of his termination did not bear a “direct relationship” to the underlying offenses on which his conviction was based.
respondents’ answer
The following are the contentions, or arguments, put forth by the respondents in answer to petitioner’s prayer for relief (the answers numerically track the petitioner’s objections):
(1) Directive Q-104 is merely conceptually derived from section 752 of the Correction Law and, as such, the coverage limitations of that statute are inapplicable to the directive.
(2) The Department of Investigation was empowered to issue directive Q-104 by virtue of joint orders issued by the Appellate Division, First Department, as well as the Appellate Division’s written approval of the department’s promulgation of the New York City Marshals Handbook of Regulations proscribing official conduct.
(3) Issuance of Q-104 was not arbitrary and capricious in that the directive provides no “blanket prohibition” against such employment, but “is only operative in those situations where there is the potential for further harm to be done to the public”, and “was promulgated to prevent the erosion of public confidence in the marshal’s system”.
*918 (4) (A) Directive Q-104 does not violate the equal protection clause because
(1) A former city marshal convicted of a crime committed “under color of official right” is rationally distinguishable from a nonmarshal felon.
(2) A former city marshal is in a much better position to repeat the crimes because he is more familiar with the opportunities and procedures.
(4) (B) Sections 9 and 10 of article I of the United States Constitution prohibit punishment for past acts. Directive Q-104 merely seeks to remedy present situations. The directive, because it is not a legislative act, is per se not a bill of attainder.
(5) (6) (7) These three claims are summarily rejected by respondents.
(8) Application of directive Q-104 to petitioner was not and is not arbitrary and capricious because the respondents were satisfied, after an investigation of the petitioner’s “clerical” duties, that “petitioner was again in a position, as a result of each one of his duties, to defraud individuals regarding the affairs of the Civil Court * * * and participate in crimes similar to those which led to his conviction.” The respondents also speak of the need to maintain the “integrity” of the marshal system.
FINDINGS OF LAW
This court will profess, at the outset, confusion regarding the particular relief sought by petitioner. Petitioner requests an order vacating respondent’s determination “prohibiting [him] from procuring employment with the office of a City Marshal.” Directive Q-104 merely directs City Marshal Jacob Ribotsky to terminate petitioner’s employment as then constituted. Language in the papers appears to indicate that petitioner might otherwise be employed in another city marshal’s office or in another type of position.
This confusion is a result of this court’s inability to ascertain the exact nature of petitioner’s employment in a city marshal’s office. But, due to the fact that the respondents do not appear confused on this point, and appear to accept petitioner’s claim that he has been so thoroughly prohibited, this court will proceed on that assumption.
*919 This court holds that the Department of Investigation was empowered to issue directive Q-104 and said issuance was neither arbitrary nor capricious.
In order to qualify as “arbitrary” and “capricious”, an administrative act must be “willful and [the result of] unreasoning action without consideration of or in disregard of the facts * * * or without determining principle”. (Matter of Elwood Investors Co. v Behme, 79 Misc 2d 910, 913.)
Joint order 453 of the Appellate Division, First Department (which petitioner admits is a viable bed of authority), specifically provides that the Commissioner of Investigation is empowered to issue directives regarding a marshal’s official duties, including the procedures for performing his duties and the conduct of marshals and their employees.
Clearly, the power to direct who a marshal may employ is a logical extension of the power to regulate a marshal’s performance of his duties.
On a similar plane, petitioner argues that the issuance of the directive is arbitrary and capricious in that it was formulated solely to provide a means by which the respondents could terminate petitioner’s (and specifically petitioner’s) services.
In support of this argument, petitioner alleges that on the date the directive was issued, July 2, 1981, only two former marshals were working in city marshals’ offices. In reply respondents allege that since 1969 there has been a total of 25 marshals either convicted, removed or forced to resign from their offices. (This allegation is supported by an affidavit of Edward I. Koch, Mayor of the City of New York. Mayor Koch’s statement avers that since he took office in 1978, disciplinary proceedings have been brought against 25 city marshals. He further affirms that the proceedings were brought as part of his plan to reform and upgrade the integrity of the deteriorating city marshal system.)
Accepting both allegations as true (for neither is controverted) this court holds that the mere fact that the directive, either when it was issued or now, may only affect a small number of individuals does not, by itself, indicate *920 either willful or unreasonable behavior. While the directive may presently affect few because few have sought reemployment, the directive has the potential for affecting many more.
Directive Q-104 is not bound by the definitional limitations of section 752 of the Correction Law. This court need not mention the pandemonium that would result if every statute that was conceptually based on another statute was required to be applied according to the restrictions contained in that model statute.
Directive Q-104 does not, on its face, violate the equal protection clause of the United States Constitution, the Human Rights Law of the State of New York (Executive Law, § 290 et seq.) or title 7 of the Civil Rights Act of 1964.
As stated earlier, the Department of Investigation is empowered to promulgate regulations concerning the conduct and performance of city marshals. Exercising this power, the department issued directive Q-104 prohibiting city marshals from employing “any former marshal who has been convicted of a crime related to the performance of his/her official duties * * * where such employment bears a direct relationship to the criminal offense for which the marshal was convicted.”
To satisfy constitutional equal protection requirements, a distinction made between two (or more) similar groups must possess some relevance to the purpose for which the classification is made. (Baxstrom v Herold, 383 US 107.)
Clearly, this is such a situation. The ostensible purpose for the directive is twofold: (1) To avoid even the appearance of impropriety, and (2) To prevent those same individuals from taking advantage of a similar situation.
That these purposes are legitimate and rational is beyond question. Thus said, it is also beyond question that the employment of a former marshal convicted felon, where such employment involves the performance of duties that bear a direct relationship to the criminal offense, is necessarily related to the announced purposes.
Concomitantly, a prohibition denying employment to nonmarshal convicted felons would not serve the above purposes. It is obvious that the feared “appearance of *921 impropriety” is substantially greater with respect to the former marshal felon. It is also obvious that a former marshal felon, as one keenly familiar with the processes and procedures of the marshal’s office, is in a much better position to engage in the proscribed conduct.
Furthermore, directive Q-104 does not violate the equal protection clause (or any other similar law) when applied to the petitioner.
Petitioner, an ex-city marshal, was convicted of “racketeering-based” crimes, said to be committed not only while he was employed as a city marshal, but arising “under color of official right.” As stated by respondents, petitioner not only committed a fraud upon certain individuals through exploitation of his position, but, by doing so, he also violated his oath of office and the public trust.
In so doing, petitioner forfeited his right to hold his position as a city marshal. And while petitionér does have a general “right to earn a living,” he does not have the right to be employed in the specific position from which he has been lawfully removed. (Board of Regents v Roth, 408 US 564.)
Petitioner apparently did, and does, possess particular expertise in the area of “marshaling.” The court also agrees that the effect of directive Q-104 is to substantially deny petitioner the ability to earn his living in the profession to which he has become affectionately and practically attached. However, the same can be said for a lawyer who is disbarred or a doctor whose license is taken away. The mere fact that a particular individual can no longer engage in a certain occupation does not give rise to the conclusion that the mandate causing that fact is unconstitutional. (Roane v Callisburg Ind. School Dist., 511 F2d 633, 635, citing Board of Regents v Roth, supra.)
Petitioner’s claim that directive Q-104 violates the constitutional prohibitions against bills of attainder and ex post facto laws are hereby rejected. As respondents correctly note, the directive is neither a “legislative act” nor “punishment for past acts.”
Finally, this court must consider whether application of directive Q-104 to petitioner was an arbitrary and capricious act by respondents.
*922 Proper application of directive Q-104 requires:
(1) A former city marshal,
(2) Who has been convicted of a criminal offense,
(3) Where said offense relates to the performance of the former marshal’s official duties,
(4) And where the present duties of the former marshal bear a direct relationship to the criminal offense for which the marshal was convicted.
It is beyond dispute that petitioner was convicted of a crime which related to the performance of his official duties. What is in dispute, however, is the exact nature of those offenses as well as the exact nature of the duties performed by petitioner in a city marshal’s office after his removal as a city marshal. Without this information, it is impossible to determine whether the duties performed bear a direct relationship to the crimes committed. Without the ability to determine the relationship between the duties and offenses, this court cannot determine whether the respondents have acted arbitrarily and capriciously.
Accordingly, this final determination is held in abeyance pending submission of a report by a referee with regard to the following factual issues:
(1) What are the underlying acts claimed to have been engaged in by petitioner that constituted the offenses for which he was convicted?
(2) What is the exact nature of the duties performed by the petitioner in City Marshal Ribotsky’s office after petitioner’s removal as a city marshal?
Upon completion of the hearing on the above issues and rendition of a referee’s report, this court will determine whether a direct relationship exists, and, from there, whether the respondents acted improperly.
Petitioner is directed to arrange a date and time for a hearing as expeditiously as possible.

. Petitioner’s conviction has since been affirmed by the United States Court of Appeals. An appeal is presently pending before the United States Supreme Court.

. That notification reads, in pertinent part:
“As explained to you during our meeting on August 25, 1981 the continued employment of former City Marshal Donald Ribotsky is in violation of this Department’s Directive Q-104, dated July 2, 1981. You are therefore directed to terminate his employment forthwith.
“The office functions being performed by your son, such as handling of process, speaking to debtors, creditors and attorneys handling payments and making entries into your books and records bear a direct relationship to the criminal offense for which he was convicted.”