Joseph PETROZZA, Plaintiff,

v.

The INCORPORATED VILLAGE OF FREEPORT; William White, individually and in his capacity as Mayor of the Village of Freeport; and G. Ruiz De Zarate, individually and in his capacity as Superintendent of Buildings for The Incorporated Village of Freeport, Defendants.

No. CV 83–3403.

United States District Court, E.D. New York.

Oct. 30, 1984.

Guggenheimer & Untermyer, New York City, New York Civil Liberties Union, Nassau Chapter, Mineola, N.Y., for plaintiff; Jerold D. Jacobson, Frederic C. Leffler, New York City, Alan Azzara, Mineola, N.Y., of counsel.

Hart & Hume, New York City, for defendants; James E. Brandt, Lester Esterman, New York City, of counsel.

*Memorandum of Decision and Order*
MISHLER, District Judge.

Defendants move for summary judgment to dismiss plaintiff's complaint pursuant to Fed.R.Civ.P. 56.

FACTS

On August 3, 1983, plaintiff commenced this action against the Incorporated Village of Freeport ("Village"), William White, individually and in his capacity as Mayor of the Village, and G. Ruiz deZarate, individually and in his capacity as Superintendent of Buildings for the Village, seeking a declaratory judgment, an injunction, reinstatement of plaintiff to his previous posi-

tion of employment and monetary damages. Plaintiff alleged three causes of action in his complaint: (1) defendants' discharge of plaintiff from his employment with the Village based on his relationship with one Salvatore Imburgio violated plaintiff's first and fourteenth amendment rights of free speech and association; (2) plaintiff's discharge was "arbitrary and capricious" and in violation of his fourteenth amendment rights to due process and equal protection; and (3) plaintiff's discharge without a hearing or some other grievance procedure to appeal his termination of employment violated his due process rights under the fourteenth amendment of the United States Constitution and under article 1, section 6 of the New York State Constitution (Comp. ¶ 16–18).

Plaintiff was hired as a plumbing inspec-tor for the Village on July 29, 1982. Plaintiff was granted this position as a "provisional appointee," under a notification which read in pertinent part on the back of the form: "Provisional employment may be terminated at any time." (deZarate Aff. p. 3 & exhibit C). At the time plaintiff was hired, Imburgio was also working for the Village as a building inspector. Imburgio, who also lived on the same street as the plaintiff, assisted in plaintiff's on-the-job training. Subsequently, Imburgio accepted a position with the Village Community Development Agency ("CDA"), where he was responsible for checking contractors' work to verify that it was done pursuant to contractual and code requirements. (Petrozza Aff., ¶ 2; Jakubowski Aff. ¶ 4).

Previously, in 1980 and 1981, Imburgio had been a candidate for the Mayor of the Village and opposed the reelection of defendant White. During this campaign, Im-burgio made various allegations concerning conflicts of interests which White and a Village Trustee, Alfred Sirlin, purportedly had.[1] Despite these political allegations, defendant White was reelected as Mayor of the Village in 1981.

In the Fall of 1982, plaintiff, as part of his employment, inspected the plumbing in the Department of Public Works project then under construction. Although there is some dispute as to which construction company was the general contractor on the job,[2] it is undisputed that plaintiff advised defendant deZarate of possible code violations by the plumbing subcontractor, Kolin Plumbing. After such information was given to defendant deZarate, plaintiff claims he was told by deZarate to "ease up" and received from him "a cartoon illustration depicting a character which he [deZarate] labeled Petrozza buried under a load of concrete with the warning that if I kept bothering Scalco (the general contractor which plaintiff alleges was responsible for the project) by strictly enforcing the plumbing codes, this could happen to me." (Petrozza Aff. ¶ 4 & Exhibit A). Plaintiff claims that as a result of this cartoon illustration, he inferred that "deZarate was advising [him to] 'look the other way,' when it concerned inspections of defendant White's administration." (Petrozza Aff. ¶ 4). Although defendant deZarate acknowledges the existence of this cartoon and admits having seen it "along with several other cartoons hanging from different places within the offices" of the Village Building Department, he denies having actually given plaintiff the cartoon. (deZarate Reply Aff. p. 6–7). Furthermore, defendant deZarate denies having told plaintiff to "ease up" and attempts to contradict this allega-

---

1. These allegations centered on defendant White's former interest in the White Insurance Agency, which purportedly had amongst its clients contracting companies who had successfully bid for Village construction projects and who were purportedly responsible for cost overruns in certain construction projects. (Petrozza Aff. ¶ 3; White Aff. p. 3–4). Although many of these allegations were investigated by the Nassau County District Attorney's Office, no indictments were returned. (White Aff. p. 4).

2. Plaintiff claims that Scalco Construction Company, the company which defendant White purportedly had conflicts of interests with, was the general contractor, (Petrozza Aff. ¶ 34), while defendants claim that Sea Crest Construction was the general contractor following Cinalta Construction Corporation's defaulted bid. (deZarate Reply Aff. p. 2–4; White Aff. p. 5).

tion by submitting to the court copies of the Village's official response to Petrozza's notification of the contractor's code violations. (deZarate Reply Aff. p. 4).[3]

On February 2, 1983, plaintiff alleges that after defendant deZarate saw him together with Imburgio during plaintiff's lunch break, deZarate, "in the presence of other employees, ... warned [plaintiff] not to associate with ... Imburgio in any way or form." (Petrozza Aff. ¶ 5; Jakubowski Aff. ¶ 6). Defendant deZarate also allegedly told plaintiff that Imburgio was a "bad influence" and if plaintiff "continued to associate with him" he (plaintiff) "would wind up on the unemployment line." (Petrozza Aff. ¶ 5; Jakubowski Aff. ¶ 6). Defendants admit that plaintiff was "told he should not associate with a Mr. Imburgio during business hours." (Defendants' 3(g) statement). After plaintiff explained to defendant deZarate that because he had several ongoing projects with CDA, he had to associate with Imburgio as a matter of necessity, deZarate allegedly told plaintiff that he could associate with Imburgio for business reasons only. (Petrozza Aff. ¶ 5).

Following this conversation, plaintiff alleges that he "made every effort to stay away from Imburgio socially, politically and professionally." (Petrozza Aff. ¶ 6).

In March, 1983, plaintiff was inspecting plumbing work at the Anchorage, a multi-dwelling housing project, whose plumbing contractor was Lakeville Plumbing, Inc. Alfred Sirlin, a Village Trustee, had a (publically) disclosed interest in this company. (Petrozza Aff. ¶ 7; Sirlin Aff. p. 2–3). Plaintiff notified the foreman to cease work pending submission of amended plans. During that same day, plaintiff alleges that Sirlin telephoned deZarate "to voice complaints." (Petrozza Aff. ¶ 7). Sirlin denies having ever made any such complaints. (Sirlin Aff. p. 1–2). Plaintiff further alleges that he was called into deZarate's office and "[i]n front of other employees, deZarate gave [him] a paper bag from Waldbaum's grocery to wear over [his] face, specifically advising [him to] use it during inspections." (Petrozza Aff. ¶ 7). Although deZarate denies that he was advising plaintiff to "look the other way" or that he brought such a bag into the office, deZarate does admit writing plaintiff's name on the bag and giving it to him to indicate "in jest, that given his knowledge of plumbing, it would make no great difference" if he wore it during his inspections. (deZarate Reply Aff. p. 5–6).[4]

On March 25, 1983, at approximately 11:30 a.m., plaintiff was observed by defendant deZarate and Frank Carry, a building inspector, leaving his house in the company of Imburgio. Plaintiff claims that he returned to his home to use his bathroom and while he was there for "no longer than five minutes," Imburgio "saw my car, and stopped and knocked on the door." (Petrozza Aff. ¶ 8). Imburgio was admitted into plaintiff's house by plaintiff's wife and purportedly discussed with plaintiff a "CDA construction job on Lillian Street for which [plaintiff] was inspecting the plumbing." (Petrozza Aff. ¶ 8).

When plaintiff returned to the office later that day, plaintiff received a formal "Warning Notice" from deZarate concerning his association or meeting with Imburgio.[5] This notice was witnessed by another

---

**3.** The Village responded in the following manner: (1) it advised David Lovejoy, Superintendent of the Department of Public Works, of Petrozza's memo to deZarate; (2) it notified the subcontractor, Kolin Plumbing Corp., that all work on this job must conform to the Village's Plumbing Code; and (3) it obtained Kolin Plumbing's permit application. (deZarate Reply Aff. p. 4 & Exhibits C–1, C–2, and C–3).

**4.** Defendant deZarate claims that Lakeville Plumbing, Inc. was, in fact, in compliance with the applicable code requirements and that it was only plaintiff's incorrect application of the Village's antiquated Code that led to the initial controversy.

**5.** The "Warning Notice" signed by deZarate read:

"After numerous verbal warnings about associating and/or meeting with Mr. Sal Imburgio of Community Development Agency I once again found the two of you together at your house during working hours (11:30 a.m.). You have also been informed that ½

employee, Milton Chester. Plaintiff claims that deZarate became "outraged" when plaintiff offered his explanation as to why he was there and that deZarate "exploded with a burst of expletives, heard by employees in an adjoining room." (Petrozza Aff. ¶ 9). Plaintiff further claims that he was then threatened by deZarate with loss of employment. (Petrozza Aff. ¶ 9; Jakubowski Aff. ¶ 6).

Defendants allege that plaintiff could not have been discussing the construction project on Lillian Street with Imburgio because according to Eric Hemphill, Director of CDA, all work was completed in that project on March 9, 1983. (Hemphill Aff. p. 2).

On March 28, 1983, defendant deZarate issued a memorandum to defendant White's attention recommending that plaintiff's employment be terminated.[6] The reasons for plaintiff's termination, as set forth in the memo, are as follows: (1) the plaintiff's March 25 visit to his house during business hours when he met Imburgio; (2) excessive sick day useage and failure to bring in a doctor's note; and (3) failure to follow adequate work procedures. In the affidavit by defendant deZarate in support of defendant's motion for summary judgment, a fourth ground for plaintiff's discharge was offered: plaintiff's failure to bring his "beeper" into the field with him on November 15, 1982. (deZarate Aff. p. 4). Plaintiff contests the validity of these grounds for his discharge.[7]

On April 4, 1983, plaintiff was notified by defendant deZarate that his employment was terminated, without any hearing or

hour for lunch is to be taken between the hours of 12:00 and 1:00 p.m."
Plaintiff stated on the notice in the space indicated for employee's remarks:
"As is necessary for all human beings to use the bathroom, I chose to use the facilities at my house as it is a time saving procedure as opposed to going back to the office at each and every necessary time—as to the arrival of _____" (illegible).

6. The text of the memo reads as follows:
Re: Joseph Petrozza—Provisional Plumbing/Building Inspector
I would like to recommend that the above named employee be terminated as of April 7, 1983, (with two weeks vacation pay), which marks the end of the pay period.
The reasons for my recommendation are as follows:
1. Even though he was warned about going home during working hours, he continued to do so. The last time was on March 25, 1983 at 11:30 a.m. On previous occasions when I asked Mr. Petrozza why he was home, he always gave me the same answer, "I had to go to the bathroom". However, this time when he came out of the house, he was accompanied by an employee of C.D.A. and, their mood seemed to be rather jovial.
2. In the past four (4) months he has been out ill five and one half (5½) days and ½ day vacation, which, considering his eight months of employment, I feel is excessive. I still have not received the required Doctor's note due us when he was out sick (2/14, 2/15, 2/16), even though I reminded him on two or three occasions. I finally had to remind him in writing. By the way, today is one of the sick days that he has taken.

3. His work and follow-up procedures are far below the standards that are expected from him after eight months of employment.
Please advise, so that we may notify Mr. Petrozza.

7. As stated above, plaintiff went home to use his bathroom facilities, not to meet intentionally with Imburgio. Plaintiff claims that this is a frequent occurrence among building inspectors. (Petrozza Aff. ¶ 13); Jakubowski Aff. ¶ 8). Plaintiff claims that March 25, 1983 was the first time defendant deZarate ever requested a doctor's note to substantiate his three days of illness in February, 1983. Furthermore, there is some dispute as to whether the union contract *requires* a doctor's note to be submitted. As to excessive use of sick days, plaintiff alleges correctly that under the union contract, he had accumulated eight sick days during his period of employment, only seven of which the defendants admit he used. (Petrozza Aff. ¶ 15; deZarate Reply Aff. p. 10–11). Plaintiff also claims that he never received any formal notices that his work was unsatisfactory. Moreover, when deZarate questioned plaintiff as to whether work reports had been submitted for March 16 and March 17, plaintiff alleges he "went over to [deZarate's] desk and showed him that he had buried [plaintiff's] reports in a pile of documents there." (Petrozza Aff. ¶ 16). Lastly, as to the "beeper" which plaintiff admits not carrying with him on November 15, 1982, he states that there was no reason to carry the beeper with him to his 8:30 a.m. inspection since when he arrived at the office at 10:00 a.m. that morning he would receive any messages for him.

grievance procedure, effective April 19, 1983. Subsequently, plaintiff filed a claim for unemployment compensation, which claim was contested by the Village on grounds of misconduct. Although this claim was initially rejected, Administrative Law Judge ("ALJ") Silberlicht reversed this determination by failing to find any misconduct on the part of plaintiff so as to justify his discharge. (Petrozza Aff. Exhibit F). The Village appealed this decision to the Unemployment Insurance Appeal Board which, on March 6, 1984, affirmed the ALJ's decision.

## DISCUSSION

■■■ We set out the general principles governing summary judgment motions. The moving party has the burden of establishing the absence of a genuine issue of fact. Fed.R.Civ.P. 56(c). *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir.1984); *United States v. One Tintoretto Painting*, 691 F.2d 603, 606 (2d Cir.1982). That burden includes the presentation by the moving party of such " 'evidence on which, taken by itself, it would be entitled to a directed verdict.' " *Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir.1972) (quoting *Radio City Music Hall Corp. v. United States*, 135 F.2d 715, 718 (2d Cir.1943)). Furthermore, the movant's burden can only be established "on the basis of admissible evidence adduced from persons with personal knowledge of the facts." *Katz v. Goodyear Tire & Rubber Co., supra*, at 244 (quoting *Burtnieks v. New York*, 716 F.2d 982, 985 (2d Cir.1983)). The opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *United States v. One Tintoretto Painting, supra*, at 606. Conclusory allegations or denials will not defeat a motion for summary judgment. *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978). "To defeat a summary judgment motion the opposing party must set forth 'supporting arguments or facts in opposition to the motion.' *S.E.C. v. Research Corp., supra*, 585 F.2d at 31. If the opponent fails to

substantiate the existence of a genuine dispute, a proper concern for judicial efficiency and the mandate of Rule 56(c) require summary disposition of the issue. *Id."* *Schering v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983). Summary judgment should not be denied on "the mere possibility that a factual dispute *may* exist," *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (emphasis in original) or a "mere hope that evidence to support his claim would develop at trial." *Taylor v. Rederi A/S Volo*, 374 F.2d 545, 549 (3d Cir.1967). Of course, "the court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Katz v. Goodyear Tire & Rubber Co., supra*, at 244. Lastly, it should be noted that in resolving whether a case is ripe for summary disposition, "the court cannot *try* issues of fact but can only determine whether there *are* issues of fact to be tried." *Id.* (quoting *Empire Electronics Co. v. United States*, 311 F.2d 175, 179 (2d Cir.1962)) (emphasis in original).

### 1. *First Amendment Issues*

■■■ To begin our analysis of whether defendant is entitled to summary judgment on plaintiff's first amendment claims, we must accept the premise which both parties have agreed to; namely, that plaintiff, as a provisional employee, without tenure, could be removed at will, with or without cause. Despite this fact that plaintiff could have been discharged with or without cause, it is equally clear that he could not be legally discharged and is entitled to reinstatement if such an employment decision was substantially motivated by and would not have occurred but for plaintiff's exercise of constitutionally protected first amendment freedoms. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570

(1972); *Pickering v. Board of Education of Township High School District 205,* 391 U.S. 563, 88 S.Ct. 1731 (1968).

*Pickering,* the seminal case in this area of first amendment law, established an overarching balancing test to guide the analysis of courts in matters such as this. "The problem ... is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering, supra,* at 568, 88 S.Ct. at 1734–35, *quoted in Connick v. Myers, supra,* 461 U.S. at 142, 103 S.Ct. at 1687. Although the Supreme Court in *Pickering* explicitly declined to adopt "a general standard against which all such statements may be judged," *Pickering, supra,* 391 U.S. at 569, 88 S.Ct. at 1735, the Court did in the *Mt. Healthy* decision enunciate a three-step process enabling the plaintiff to prove his case. *Mt. Healthy, supra,* 429 U.S. at 287, 97 S.Ct. at 576; *see Givhan v. Western Line Consolidated School District, supra,* 439 U.S. at 416, 99 S.Ct. at 697.

Applying *Mt. Healthy* to the case at bar, we conclude: (1) plaintiff has the burden "to show that his conduct was constitutionally protected" by the first amendment, *see Mt. Healthy, supra,* 429 U.S. at 287, 97 S.Ct. at 576; (2) plaintiff has the burden to establish that this constitutionally protected conduct was a "substantial" or "motivating factor" in the defendant's decision to discharge him, *see id.*; and (3) if plaintiff carries this two-fold burden, then the defendants must show "by a preponderance of the evidence that it would have reached the same decision" as to plaintiff's discharge even if plaintiff had not engaged in constitutionally protected conduct, *see id.*

*Connick v. Myers* clearly indicates that if plaintiff's speech and associational conduct as a governmental employee "cannot be fairly characterized as constituting speech [and association] on a matter of public concern," then it becomes unnecessary to examine the grounds for plaintiff's

discharge. *Connick v. Myers, supra,* 461 U.S. at 146, 103 S.Ct. at 1689, 1670. *Connick v. Myers* instructs the court to examine "the content, form, and context of a given statement" to analyze whether the employee's speech is a matter of public concern. *Id.* at 147, 103 S.Ct. at 1690.

In the case at bar, plaintiff raises issues of both constitutionally protected conduct (association with defendant White's political opponent, Imburgio) and constitutionally protected speech (communications regarding alleged code violations by contractors).

█ It is well recognized that freedom of association, especially for politically related reasons, is constitutionally protected conduct. *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *see also Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965) (Court's concern for the "sensitive nature of constitutionally protected expression" and association warranted the unusual remedy of a permanent injunction from state prosecution for the plaintiff); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957) (Court upheld the due process rights of "subversive persons" against the rights of legislators to be informed on the subject of governmental self-preservation, stating that: "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association"). It is undisputed that plaintiff was warned not to associate with Imburgio, a political opponent of defendant White, whom defendant deZarate allegedly characterized as a "bad influence" on plaintiff. (Petrozza Aff. ¶ 5; Jakubowski Aff. ¶ 6). Plaintiff claims he made every effort to avoid associating with Imburgio politically, socially or professionally as a result of these warnings and threats of discharge.

Furthermore, plaintiff had conversations with defendant deZarate concerning both the Department of Public Works project and the Anchorage project as to code violations he observed. Plaintiff claims that he was advised by defendant deZarate to

"ease up" and, in effect, to overlook any violations he observed at these two sites, both of which sites were focal points in the political controversy raised by Imburgio in his mayoral candidacy. As to whether deZarate responded to plaintiff's information on these occasions in this matter is a genuinely disputed fact. If the court is to draw all reasonable inferences against defendants, the moving party, *Katz v. Goodyear Tire & Rubber Co., supra,* at 244, then the possibility that plaintiff's first amendment rights were chilled becomes a cognizable claim. This is particularly true in light of *Connick v. Myers,* which clearly implies that "to bring to light actual or potential wrongdoing or breach of public trust" on the part of the defendants is information the public needs to "evaluate the performance of [their] office" and hence, is a matter of public concern. *Connick v. Myers, supra,* 461 U.S. at 148, 103 S.Ct. at 1690–91.

Defendants attempt to rebut these claims of constitutionally protected speech and association by asserting that plaintiff's conduct is analogous to the plaintiff's conduct in *Connick v. Myers, supra.* Specifically, defendants argue that their warnings to plaintiff not to associate with Imburgio falls within the "wide latitude" government officials enjoy in managing their office. *Id.* at 146, 103 S.Ct. at 1690. Furthermore, they assert that under *Pickering, supra,* an employee's "[c]onduct which challenges supervisors and threatens institutional harmony and efficiency cannot be considered constitutionally protected 'speech.'" *Orshan v. Anker,* 489 F.Supp. 820, 822 n. 1 (E.D.N.Y.1980) (citing *Pickering, supra,* 391 U.S. at 569–70, 88 S.Ct. at 1735).

The language in *Connick v. Myers,* as to government officials' "wide latitude" in managing their office begs the question presently at issue, since the Court limited this statement's applicability only to situations where the challenged conduct is *not,* as a matter of law, of public concern.

*Connick v. Myers, supra,* 461 U.S. at 146, 103 S.Ct. at 1690. In regards to defendants' other argument that plaintiff's conduct is not constitutionally protected because it is merely disruptive to the office's efficiency and harmony, the facts, as set forth previously, are in genuine dispute on this point.

■ Considering the foregoing finding that there exists material fact disputes surrounding the alleged constitutional conduct, the court cannot conclude as a matter of law, that plaintiff's alleged constitutional conduct was not a "substantial" or "motivating factor" in the defendants' decision to discharge him. This conclusion is buttressed by the well established principle that questions of causation [8] are generally questions of fact to be submitted to the jury. *See* Prosser, Law of Torts § 45 (4th ed. 1971). Thus, defendants' motion for summary judgment on plaintiff's first amendment claim is denied.

### 2. *Due Process—Right to a Hearing*

■ Plaintiff also claims that his discharge without a hearing or some other grievance procedure to appeal his termination violated his due process rights. Since plaintiff concedes that as a provisional employee, without tenure, he could have been discharged with or without cause, there is little need to address whether any property interest was deprived without due process. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

To establish that plaintiff was deprived of a liberty interest without due process because defendants imposed a stigma upon plaintiff's "good name, reputation, honor, or integrity," *id.* at 573, 92 S.Ct. at 2707, which thereby restricted his ability to seek employment elsewhere, plaintiff must show the following elements:

[T]he stigmatizing information must be false, *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 91 [92] (1977) (per curiam), and made public, *Bishop v.*

---

8. The Supreme Court in the *Mt. Healthy* decision characterized the question of whether the constitutional conduct was a "substantial factor" in the controversial employment decision as one of causation. *See Mt. Healthy, supra,* 429 U.S. at 286–87, 97 S.Ct. at 575–76.

*Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), by the offending governmental entity, *see Paul v. Davis,* 424 U.S. 693, 708–10, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

*Gentile v. Wallen,* 562 F.2d 193, 197 (2d Cir.1977); *see Quinn v. Syracuse Model Neighborhood Corp., supra,* at 446.

We conclude, as a matter of law, that the requisite elements for a deprivation of due process claim are lacking for the following reasons.

First, plaintiff has not shown that his reputation, good name, honor, or integrity has been stigmatized by his discharge. Although he does make conclusory allegation to that effect, such allegations, by themselves, are insufficient. *See Schering v. Home Ins. Co., supra,* at 9. Plaintiff claims that a stigma was created by both defendants' Warning Notice and defendants' memorandum recommending his discharge. The context of these documents, however, pertain to job-related shortcomings which do not place in question plaintiff's integrity and reputation. *See Board of Regents v. Roth, supra,* 408 U.S. at 572, 92 S.Ct. at 2706–07; *Gentile v. Wallen, supra,* at 197; *Russell v. Hodges,* 470 F.2d 212, 216–17 (2d Cir.1972).

It is well settled that for a discharge to create a "stigma," "it must be something considerably graver than a charge of failure to perform a particular job." *Russell v. Hodges, supra,* at 217. Plaintiff attempts to utilize the "paper bag-over-his-head" incident and his alleged suffering of verbal expletives at the hands of defendant deZarate to establish the stigma. These incidents, however, cannot form the basis of the stigmatizing information since they lack the requisite element of falsity. *Codd v. Velger, supra,* 429 U.S. at 627–29, 97 S.Ct. at 883–85; *Gentile v. Wallen, supra,* at 197.

Second, plaintiff has failed to establish that the reasons for his discharge were made public, although *Bishop v. Wood* requires him to do so. *Bishop v. Wood,*

*supra,* 426 U.S. at 348–49, 96 S.Ct. at 2079–80. He has thus created no genuine factual dispute on this issue other than his mere conclusory allegations.

Thus, defendants' motion for summary judgment on plaintiff's claim of a due process right to a hearing should be granted.

### 3. *Arbitrary and Capricious Discharge*

Plaintiff has offered no evidence or argument in opposition to defendants' motion for summary judgment on plaintiff's claim that his discharge was arbitrary and capricious and in violation of his fourteenth amendment rights of due process and equal protection. Since the law is clear that plaintiff as a non-tenured provisional employee can be removed with or without cause, *Riggi v. Blessing,* 9 A.D.2d 423, 195 N.Y.S.2d 971, *aff'd,* 10 N.Y.2d 917, 223 N.Y.S.2d 871, 179 N.E.2d 711 (1961); *City of Binghamton v. Binghamton Civil Serv.,* 63 A.D.2d 790, 404 N.Y.S.2d 918 (1978), defendants' motion on this claim is granted.

### CONCLUSION

Defendants' motion for summary judgment is granted in part and denied in part as follows: defendants' motion for summary judgment on plaintiff's claim that his discharge violated his first and fourteenth amendment rights of free speech and association is denied, but defendants' motion for summary judgment on all of the plaintiff's other claims is granted, and it is

SO ORDERED.