**Dr. Judith PIESCO, Plaintiff,**

v.

**The CITY OF NEW YORK, DEPARTMENT OF PERSONNEL, Juan Ortiz, Nicholas LaPorte, Jr., and Edward I. Koch, Defendants.**

No. 85 Civ. 9893 (JSM).

United States District Court,
S.D. New York.

Dec. 18, 1990.

See also 650 F.Supp. 896, 693 F.Supp. 86.

Ronald Podolsky, New York City, for plaintiff.

Victor A. Kovner, Corp. Counsel of City of New York by Paul Marks, Asst. Corp. Counsel, New York City, for defendants.

## MEMORANDUM OPINION

MARTIN, District Judge.

This matter is before the Court on motion for summary judgment by the defendants. At issue is the claim of plaintiff, Dr. Judith Piesco, an at-will employee of the City of New York Department of Personnel, that she was improperly discharged from her position as Deputy Personnel Director for Examinations because of her exercise of First Amendment rights in statements she made to the New York State Senate Committee on Investigation, Taxation and Government Operations (the "State Senate Committee"), in June and July of 1985.

In addition to her claim based upon the First Amendment, plaintiff also alleges that her discharge constituted an unconstitutional deprivation of her due process property and liberty rights. Finally, plaintiff asserts pendent state law claims for wrongful discharge, intentional infliction of emotional distress and prima facie tort. For the following reasons, defendants' motion for summary judgment is granted in its entirety.

## FACTUAL BACKGROUND

In September of 1982, plaintiff was appointed to the position of Deputy Personnel Director for Examinations in the New York City Department of Personnel (the "DOP"). The Deputy Personnel Position was an in-house position which plaintiff held on a provisional basis.

The record leaves little question that plaintiff was far from a model employee before she appeared before the State Senate Committee. For example, plaintiff has admitted that at a May 1984 meeting with representatives of the Sanitation Department, she called the Sanitation Commissioner, Norman Steisel, who was not present, a "fucking liar." Similarly, at a March 1985 meeting with Police Department officials and First Deputy Mayor Stanley Breznoff, plaintiff called the Police Department's chief of personnel, who was present, a "liar." These and other remarks of the plaintiff apparently led to complaints about her from Deputy Mayor Breznoff, Police Commissioner Benjamin Ward and the Chief of the General Litigation division of the New York City Law Department.

Although, the City now cites these incidents as providing a basis for the decision to terminate plaintiff, it does not appear from the record before the Court that those incidents were the basis of any disciplinary action against plaintiff prior to the time she made the statements to the State Senate Committee which give rise to her claim that her discharge violated her First Amendment rights.

In these circumstances, for the purpose of this summary judgment motion, the Court could not conclude that the incidents that took place prior to plaintiff's statements to the State Senate Committee were the basis for her subsequent termination. Thus, the Court must look to the statements which plaintiff made to the State Senate Committee and her subsequent conduct to determine whether there is a triable issue of fact on the question of whether plaintiff was improperly terminated because of her exercise of her First Amendment rights.

In order to understand the First Amendment issues raised in this lawsuit, it is necessary to consider the background of plaintiff's appearance before the State Senate Committee. As part of her duties as Deputy Personnel Director for Examinations, plaintiff was responsible for the de-

velopment and administration of all civil service examinations for the City of New York, which included the examinations for incoming police officers. In December 1984, Examination No. 4061 for police officers was administered by the City. In February 1985, the plaintiff and other officials of the DOP met with representatives of the Police Department, including Police Commissioner Ward, to establish a passing grade for Examination No. 4061. At that meeting, the Police Department personnel advocated a passing grade of 82, while plaintiff advocated setting the passing mark at 89. Ultimately the passing grade was set at 85, which meant that a successful candidate was required to answer correctly 119 of the test's 140 questions. To achieve a score of 89, a candidate would have been required to answer correctly 125 of the 140 questions.

In June of 1985, plaintiff and the defendants Juan Ortiz, then DOP's Personnel Director, and Nicholas LaPorte, then DOP's First Deputy Personnel Director, met with members of the State Senate Committee which was then conducting a review of the management of the New York City Police Department. While there is a factual dispute in the record as to who first used the term "moron", plaintiff or a member of Senate committee staff, it is clear that, at a minimum, plaintiff responded affirmatively when asked if it was possible that "a moron could pass" with the test score set at 85.

On July 11, 1985, plaintiff testified before the State Senate Committee and the following colloquy took place:

SENATOR GOODMAN: Is it not a fact that under questioning by this commission's staff you indicated that the written exam was so easy "that a moron could pass?"

DR. PIESCO: The conversation that we had was a very informal conversation, and if I used it as characterization, I think it was rather unfortunate. I was not obviously aware of the ... that the conversation which was informal was in the way of cross-examination. I certainly would have modified my state-

ment merely because the term "moron" is rather offensive and has certain technical meanings. The answer to your question is yes.

\*   \*   \*   \*   \*   \*

SENATOR GOODMAN: Would a functional illiterate pass the functional portion in the police academy?

DR. PIESCO: At the pass mark that is set I would say that is possible.

It is apparent that plaintiff's testimony before the State Senate Committee caused some uproar and consternation within City government. On July 12, the day following plaintiff's testimony, her superior, Mr. Ortiz, wrote a memorandum to then-Mayor Koch "to give you some background on the issues raised in yesterday's hearings before the Goodman Committee...." That memorandum stated in part:

It should be noted that the difference in a score of 89 and 85 percent is six items out of a 140 question test. Furthermore, 85 percent yielded a greater pool of candidates to meet the Department's hiring needs. And, at that pass mark, the disparate impact of the test was significantly minimized, thus reducing the risk of litigation and a possible injunction against all hiring. A passing score of 85 percent meant that a successful candidate correctly answered 119 out of 140 items on a exam which was written above the tenth-grade reading level. It is obvious, therefore, that to call any successful candidate a 'moron' or 'functional illiterate,' is irresponsible because it is without basis in fact.

The following day, July 13, 1985, the New York Post carried an article quoting Ortiz as saying "that sworn comments by his deputy about 'functional illiterates' passing the last police exam were 'irresponsible'" and he hinted he may fire her.

The next event of significance with respect to this litigation occurred on July 31, 1985, when a meeting was held at the DOP concerning Examination No. 4061. At this meeting were plaintiff, defendants Ortiz and LaPorte, the Department's General Counsel, Arthur Friedman, and its Deputy General Counsel, Michael Rabin. On August 2, 1985, defendant Ortiz prepared a

memorandum to plaintiff setting forth what occurred at that meeting, which plaintiff subsequently acknowledged to be accurate in substance.

The memorandum reflects that after Ortiz raised a question concerning plaintiff's admitted failure to look at the test or the questions before the test was administered, plaintiff "stood up, pointed [her] finger at [Ortiz] in an aggressive manner and yelled, 'You don't know a fucking thing about testing. I am fed up with your bullshit ...'" Ortiz then asked plaintiff to calm down and conduct herself in a civil manner to which plaintiff replied, "I don't have to do a fucking thing. Why don't you fire me."

On August 13, 1985, plaintiff received two performance evaluations from the defendant LaPorte. For the period July 1, 1983 through June 30, 1984, plaintiff was rated "very good." She received a "marginal" rating for the period July 1, 1984 through June 30, 1985." According to plaintiff, in November or December 1985, Ortiz ordered her not to speak to a reporter for WNBC–TV. A memorandum to the file from Ortiz, dated December 9, 1985, indicates that an NBC reporter had requested plaintiff to appear, but Ortiz had decided to send another representative of the DOP.

On December 23, 1985, plaintiff served defendants with a summons and complaint in this action in which she alleged that in retaliation for her testimony before the State Senate Committee, she had been deprived of a raise, by her employer, the City of New York Department of Personnel, had been excluded and prevented from attending various meetings which her position required her to attend, and that defendant Ortiz, in non-privileged communications, intentionally and maliciously stated that Dr. Piesco was irresponsible and derelict in the performance of her duties. On December 27, 1985, defendant Ortiz informed plaintiff that her employment was terminated as of that date.

## DISCUSSION

### I. Plaintiff's First Amendment Claim

While plaintiff asserts several causes of action, the heart of her complaint is the claim that she was terminated for the exercise of her First Amendment rights in connection with her statements to the State Senate Committee.

It is now beyond dispute that a public employee does not relinquish his or her First Amendment rights to comment on matters of public interest as a result of the individual's status as a governmental employee. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983); *Rankin v. McPherson*, 483 U.S. 378, 383–84, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987), *reh. den.* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987). As the Supreme Court recognized in *Pickering*, a state employee's "right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." 391 U.S. at 574, 88 S.Ct. at 1738. At the same time, the Supreme Court has also recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734.

Thus, the determination whether a public employer has properly discharged an employee for engaging in speech of a public nature requires the Court "to arrive at a balance between the interest of the [employee] as a citizen in commenting upon matters of public concern and the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35; *see also Connick*, 461 U.S. at 140, 103 S.Ct. at 1686. As the Supreme Court reasoned:

[t]his balancing test is necessary in order to accommodate the dual role of the public employer as provider of public services and as a governmental entity operating under the constraints of the First Amendment. On the one hand, public employers are *employers*, concerned

with the efficient function of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of public functions. On the other hand, 'the threat of dismissal from public employment is ... a potent means of inhibiting speech.'

*Rankin,* 483 U.S. at 384, 107 S.Ct. at 2897 (emphasis in original).

■ Here, Dr. Piesco's statements to the State Senate Committee did relate to matters of public concern and therefore raise First Amendment issues which require application of the *Pickering* balancing test. The question the Court must decide under *Pickering* is whether, despite the First Amendment implications in her statements, the City was nonetheless justified in terminating Dr. Piesco's employment because of those statements. This is a question of law that is properly decided on a motion for summary judgment. *Connick,* 461 U.S. at 148 n. 7 and 150 n. 10, 103 S.Ct. at 1690 n. 7 and 1692 n. 10; *Giacalone v. Abrams,* 850 F.2d 79, 87 (2d Cir.1988).

■ Application of the *Pickering* balancing test to the present facts compels the conclusion that the City's interest, as an employer, in promoting the efficiency of the public services it performs outweighed plaintiff's interest, as a citizen, in speaking out on matters of public concern. The Court recognizes that, in the context of a legitimate inquiry by a State Senate Committee, Dr. Piesco was required to truthfully state her views on the validity of the passing grade established for the police examination and the issues presented before the Committee were clearly of public concern.

In determining that the City's interests outweigh the plaintiff's such that the discharge of Dr. Piesco because of her statements to the State Senate Committee was constitutionally permitted, we focus on the nature of plaintiff's comments viewed in the light of her responsibilities as Deputy Personnel Director for Examinations.[1]

The fixing of an appropriate passing grade for the police entry level examination, while one of public concern, was also one requiring sensitivity to the need to resolve competing social interests in an atmosphere free from public hysteria. As the memorandum from defendant Ortiz to then-Mayor Koch of July 12, 1985 indicates, one of the issues which had to be considered in setting the passing grade for the test was "the mandate of Title VII to minimize disparate impact on minority candidates." Selecting a passing grade of 85 percent rather than 89 percent "yielded a greater pool of candidates to meet the Department's hiring need. And, at that pass mark, the disparate impact of the test was significantly minimized." As Dr. Piesco's affidavit demonstrates, she was aware that, prior to 1985, there had been litigation brought by a class of minority group members challenging the written test used by the City to screen applicants for the Police Department on the ground that such tests were not job-related and had a disparate impact on minority members. *Guardians Ass'n of New York City Police Department v. Civil Service Commission of the City of New York,* 633 F.2d 232 (2d Cir. 1980), *aff'd,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3568, 77 L.Ed.2d 1410 (1983). Thus, the issue of the appropriateness of an 85% passing mark was one of important concern to the senior members

---

1. In performing the balancing test, the Supreme Court requires that the subject speech not be "considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899, *citing, Connick,* 461 U.S. at 152–53, 103 S.Ct. at 1692–93; *Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696, 58 L.Ed.2d 619 (1979).
In addition, the Supreme Court has considered as pertinent factors:

whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899, *citing, Pickering,* 391 U.S. at 570–573, 88 S.Ct. at 1735–1737.

of the City's administration, including the leaders of the Police Department and plaintiff's superiors in the Department of Personnel.

With this background, Dr. Piesco could not have failed to understand that her comments on the passing grade for the test were being made in the emotionally charged atmosphere of public debate on the minority hiring policies of the New York City Police Department. Thus, while Dr. Piesco had a right to express her views on the appropriateness of selecting a passing grade of 85 for the police examination, as a senior public official she had the obligation to insure that her comments accurately reflected legitimate concerns, did not exacerbate unnecessarily a sensitive public issue and did not unfairly undermine the judgment made by her superiors and the senior officials of the Police Department. In these circumstances, it was totally inappropriate for Dr. Piesco to have stated that a "moron" could have passed the test, whether or not she herself interjected the term or simply acquiesced in someone else's characterization.[2]

Similarly, it was irresponsible for Dr. Piesco to testify that it was possible for a functional illiterate to pass the examination with a score of 85. The affidavits of Dr. Yakowicz in support of the motion for summary judgment indicates that even accounting for exceptionally good luck, a functional illiterate could not achieve a score of more than 60% on the test, i.e., a score of 85 correct answers out of a total of 140 questions. While it might be inappropriate to accept Dr. Yakowicz's affidavits as conclusive on a motion for summary judgment, Dr. Piesco's own affidavit responding to Dr. Yakowicz indicates that, if there was any possibility that a functional illiterate could pass the examination at a passing grade of 85%, that possibility was at best theoretical. Indeed, since the passing grade Dr. Piesco advocated—89%—involved answering correctly only 6 more of a total of 140 questions than would a score of 85%, it is impossible to conclude that she

honestly believed that there was a real possibility that a functional illiterate would pass the test at the lower grade level.

It is not necessary, therefore, to resolve the conflict between Dr. Yakowicz and Dr. Piesco to conclude that it was irresponsible for Dr. Piesco to testify in a public hearing that it was possible for a functional illiterate to achieve a passing grade of 85% without amplifying her testimony to indicate how extremely remote that possibility was.

Plaintiff's superiors were amply justified in characterizing her testimony to the State Senate Committee as irresponsible. In determining whether that conduct was sufficient to justify her dismissal, weight has to be given to the important position which Dr. Piesco held for, as the Supreme Court has stated:

> ... In weighing the state's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails.

*Rankin*, 483 U.S. at 390, 107 S.Ct. at 2900.

As Deputy Personnel Director for Examinations and the chief official responsible for civil service examination matters in New York City, it was critical that plaintiff maintain a working relationship of trust and confidence not only with defendants Ortiz and LaPorte but also with other high-level City officials, including those in the Police Department. For a senior City official of Dr. Piesco's stature to make an irresponsible and inflammatory statement concerning a matter of such clear public concern as the appropriate passing level for candidates for the Police Department was certainly enough to undermine not only her relationship with her superiors but also her relationship with senior officials in the Po-

---

**2.** There is a sharp dispute as to whether or not Dr. Piesco herself introduced the term "moron" into the discussion with the staff of the State Senate Committee.

lice Department. Given the importance of these working relationships to the performance of Dr. Piesco's important responsibilities, her conduct justified her termination. As the Supreme Court also recognized in *Rankin:*

> [i]nterference with work, personal relationships or the speaker's job performance can detract from the public employer's function. Avoiding such interference can be a strong state interest.

483 U.S. at 388, 107 S.Ct. at 2899.

Thus, in applying the *Pickering* balancing test and looking solely at Dr. Piesco's statements to the State Senate Committee, the Court concludes that the City was justified in terminating her employment and is entitled to summary judgment on this claim.

■ Even if the City had not been justified in terminating Dr. Piesco's employment based solely upon her statements to the State Senate Committee, summary judgment would still be appropriate given her subsequent conduct. While it might be argued that the question of whether Dr. Piesco's subsequent conduct provided justification for her termination involves factual issues of motivation that should not be decided on a summary judgment motion, in order "to arrive at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State as employer," which *Pickering* requires, 391 U.S. at 568, 88 S.Ct. at 1734–35, the Court cannot ignore undisputed subsequent conduct which clearly belongs in the balance. As the Supreme Court noted in *Connick v. Myers,* this is the type of situation which the Court cannot "avoid making an independent constitutional judgment of the facts of the case." 461 U.S. at 150, n. 10, 103 S.Ct. at 1692, n. 10, *quoting, Jacobellis v. Ohio,* 378 U.S. 184, 190, 84 S.Ct. 1676, 1679, 12 L.Ed.2d 793 (1964). Indeed, it would be unreasonable to ignore plaintiff's subsequent conduct in making the "constitutional judgment" since "[t]he *Pickering* bal-

ance requires *full consideration* of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick,* 461 U.S. at 150, 103 S.Ct. at 1692 (emphasis added).

Thus, in assessing the City's claim that it was justified in firing Dr. Piesco, the Court cannot ignore the fact that subsequent to the allegedly protected First Amendment statement to the State Senate Committee in June and July of 1985, plaintiff told her superior Mr. Ortiz "You don't know a fucking thing about testing. I am fed up with your bullshit ..." and, when told to calm down, stated "I don't have to do a fucking thing. Why don't you fire me?"

If plaintiff's statements before the Committee did not fatally undermine plaintiff's authority and destroy the close working relationships which were required for her to effectively perform her responsibilities, then plaintiff's outburst of expletives directed at her immediate supervisor certainly accomplished the task. As the Supreme Court said in considering an analogous situation presented in *Connick,* 461 U.S. at 154, 103 S.Ct. at 1694 (1983):

> [t]he limited First Amendment interest involved here does not require that [the employer] tolerate action which he reasonably believed would disrupt the office, undermine his authority and destroy close working relationships.

This case, like all cases involving the *Pickering* balance, turns upon the particular facts and circumstances. In the present situation, the undisputed facts established that plaintiff's conduct exceeded the bounds protected by the First Amendment. Thus, the Court concludes that plaintiff's statements—whether considering her testimony alone, her post-testimony statements alone or the statements in total—so severely undermined the working relationships which were required for an effective performance of her duties that the City's interest as an employer outweighs Dr. Piesco's speech interest.[3]

---

**3.** Since the Court concludes that First Amendment considerations did not preclude the City from firing Dr. Piesco on the basis of her State

Senate Committee testimony alone or on the basis of her July 31, 1990 statements, it is irrele-

## II.  Qualified Immunity

■ Even if the Court had not determined that the *Pickering* balancing test favored the defendants, the Court, for the reasons discussed below, would nevertheless grant the motion of defendants La-Porte and Ortiz seeking dismissal on the grounds of qualified immunity.

It is well-settled that government officials performing discretionary functions are shielded from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Magnotti v. Kuntz,* 918 F.2d 364 (2d Cir.1990); *Russell v. Coughlin,* 910 F.2d 75 (2d Cir.1990). Even when such rights are clearly established, qualified immunity also protects a government official "if it was objectively reasonable for [the official] to believe that his acts did not violate those rights." *Robison v. Via,* 821 F.2d 913, 921 (2d Cir. 1987); *see also Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

For purposes of the issue of qualified immunity, "we need answer only the limited question of whether it should have been apparent to [defendants LaPorte and Ortiz] that [plaintiff's] discharge violated [her] First Amendment rights." *Giacalone,* 850 F.2d at 88. Based upon our prior discussion of plaintiff's responsibilities and the disruption that plaintiff's conduct caused to the effective operation of the employer's office as well as to her working relationships, we conclude that the *Pickering* balancing test and the decisions construing it at the time of plaintiff's discharge (as well as decisions subsequent to the discharge) "would more likely have suggested" to defendants that plaintiff's "First Amendment interest was outweighed by the disruption [her] action fostered." *Id.* As such, the Court concludes that defendants LaPorte and Ortiz are immune from individual liability for damages.

## III.  Additional Constitutional and State Law Claims

Apart from her First Amendment claim, Dr. Piesco also asserts a number of other constitutional and common law claims. For the following reasons, defendants' motion for summary judgment with respect to each of these claims is granted.

Specifically, Dr. Piesco alleges that her dismissal amounted to a deprivation of her property interest without due process of law in violation of the Fifth and Fourteenth Amendments. In order to prevail, plaintiff must have had "constitutionally protected property ... or liberty rights to which the Fourteenth Amendment's procedural protections would attach." *Schwartz v. Mayor's Comm. on Judiciary,* 816 F.2d 54, 56 (2d Cir.1987), *citing, Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). However, as the Supreme Court explained in *Roth:*

> [t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

408 U.S. at 577, 92 S.Ct. at 2709.

"In the employment context, a property right arises only where the state is barred, by statute or contract, from terminating (or not renewing) the employment relationship *without cause.*" *S & D Maintenance Co. v. Goldin,* 844 F.2d 962, 967 (2d Cir.1988) (emphasis in original); *Cf. Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985) (property interest created by state civil service statute's for-cause termination provision) with *Bishop v. Wood,* 426 U.S. 341, 345, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (no property interest due to absence of for-cause provision) and *Roth, supra,* 408 U.S. at 578, 92 S.Ct. at 2709 (same).

In interpreting the Supreme Court's holdings, the Second Circuit has repeatedly found that an employee who, by relevant

vant that the actual decision to terminate her

employment was not made immediately.

statute, may be discharged without cause and without a hearing, does not possess a property right protected by the due process clause of the Constitution. *Goetz v. Windsor Central School District*, 698 F.2d 606, 608 (2d Cir.1983); *Baden v. Koch*, 638 F.2d 486, 492 (2d Cir.1980), *later app.*, 799 F.2d 825, 829 (2d Cir.1986); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 448 (2d Cir.1980).

█ In the present action, Dr. Piesco does not dispute that she was appointed in 1982 to the civil service title of provisional Administrative Staff Analyst and served in the in-house position of Deputy Personnel Director of Examinations. *See* Piesco February 24, 1986 Deposition, pp. 4–5; the defendants' Rule 3(g) statement ¶ 1 and Exhibit 1 to defendants' motion for summary judgment.[4] Plaintiff also does not dispute that, prior to her termination, she was a provisional employee under New York Civil Service Law § 65. Under New York State law, defendants are free to terminate provisional employees for any reason or for no reason at all. *See Preddice v. Callanan*, 69 N.Y.2d 812, 813–14, 513 N.Y.S.2d 958, 959, 506 N.E.2d 529 (1987) ("Appointments made pursuant to Civil Service Law § 65 are provisional in nature; provisional employees have no expectation of tenure and rights attendant thereto ... and therefore they may be terminated at any time without charges proffered, a statement of reasons given or a hearing held").

Accordingly, since plaintiff possessed no statutory property right in her position and the record presents no evidence that plaintiff possessed a property right based upon the parties' "mutually explicit understanding," *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), defendants' motion to dismiss this portion of plaintiff's due process claim is granted.

█ Plaintiff also appears to allege that defendants deprived her of a constitutionally protected liberty interest in her "good name, reputation, honor or integrity."

*Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). In support of this claim, plaintiff alleges that she received yearly evaluations that were false and malicious and calculated to harm plaintiff's reputation, *see* Amended Complaint, ¶ 27(a), and that defendant Ortiz, in a "non-privileged communication," stated that plaintiff was "irresponsible and derelict in the performance of her duties ..." *Id.* ¶ 27(d). Apparently, the "non-privileged communication" to which plaintiff refers without specification is Ortiz' July 12, 1985 memorandum to the then-Mayor Koch in which Ortiz stated that "to call any successful candidate a 'moron' or a 'functional illiterate' is irresponsible because it is without basis in fact." Plaintiff further charges, in opposition to defendants' motion, that she was stigmatized by a newspaper article in which then-Mayor Koch stated that plaintiff had "an axe to grind" (July 13, 1985 *New York Post*) and by an article in which defendant Ortiz is quoted as stating that he refused to redo his performance evaluations of plaintiff (January 4, 1986 *The New York Times*).

A government employee's liberty interest is implicated where the government has dismissed an employee based on charges "that might seriously damage [her] standing and associations in [her] community" or that might impose "on [her] a stigma or other disability that foreclose[s] [her] freedom to take advantage of other employment opportunities." *Brandt v. Board of Cooperative Educational Services, Third Supervisory Dist.*, 820 F.2d 41, 43 (2d Cir. 1987), *quoting, Roth*, 408 U.S. at 573, 92 S.Ct. at 2707. In addition, the charges against the employee must be made "public" by the government employer, *Bishop*, 426 U.S. at 348–49, 96 S.Ct. at 2079–80; *Quinn*, 613 F.2d at 446–47, and the employee must allege that the charges are false. *Brandt*, 820 F.2d at 43, *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 883, 51 L.Ed.2d 92 (1977).

**4.** Paragraph 1 of defendants' Rule 3(g) statement sets forth the provisional nature of plaintiff's employment. Plaintiff, as required, submitted her own Rule 3(g) statement in which she failed to take issue with ¶ 1 of defendants' Rule 3(g) statement.

An essential element of a deprivation of liberty claim is that the stigmatization result from the termination. *Gentile v. Wallen*, 562 F.2d 193, 197 (2d Cir.1977); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), *reh. denied*, 425 U.S. 985, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). In other words, it is not sufficient for a liberty claim "that there simply be a defamation by a state official; the defamation had to occur in the course of the termination of employment." 424 U.S. at 710, 96 S.Ct. at 1165; *see also Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989).

In the present case, plaintiff cannot rely on either the Ortiz' performance evaluations or on Ortiz' memorandum to Koch since the allegedly stigmatizing statements contained in these documents were not published in the course of plaintiff's termination.[5] Moreover, without reaching the issue of falsity and even assuming that the "publication" requirement has been satisfied with respect to any or all of the materials upon which plaintiff relies, the Court finds that the statements were not sufficiently stigmatizing to support a due process claim. First, plaintiff has not shown that her reputation, good name, honor or integrity has been stigmatized by her discharge. "It is well settled that for a discharge to create a 'stigma,' 'it must be something considerably graver than a charge of failing to perform a particular job.'" *Petrozza v. Freeport*, 602 F.Supp. 137, 144 (E.D.N.Y.1984), *quoting, Russell v. Hodges*, 470 F.2d 212, 217 (2d Cir.1972). Here, while defendants' statements may have amounted to a shade more than simply that plaintiff could not adequately fulfill her responsibilities, the statements nevertheless fall far short of the type found stigmatizing by courts in this Circuit. *Cf., e.g., Brandt v. Board of Cooperative Educational Services, Third Super-*

*visory District*, 820 F.2d 41, 43 (2d Cir. 1987) (in action in which teacher terminated due to his alleged sexual misconduct involving autistic students, court recognized that "charges that the employee is guilty of dishonesty or immorality are stigmatizing") and *Saraceno v. Utica*, 733 F.Supp. 538, 543 (N.D.N.Y.1990) (allegations of insubordination, incompetence and misconduct insufficient). Second, plaintiff has not alleged, let alone demonstrated, that, in the five years since she was terminated, her future employment opportunities have been irreparably damaged by the "publication" of the allegedly stigmatizing materials. *Roth*, 408 U.S. at 574, 92 S.Ct. at 2708. Accordingly, the Court finds that there is no genuine issue of fact as to plaintiff's assertion of a deprivation of a liberty interest.

■ The Court also grants defendants' motion to dismiss plaintiff's pendent state law claims. Plaintiff asserts claims for wrongful discharge, intentional infliction of emotional distress and prima facie tort. However, these claims were foreclosed by the New York Court of Appeals' holding in *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). In this action, the Court declined the plaintiff's invitation to alter New York's "long settled rule that where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason at all." 58 N.Y.2d at 301–302, 461 N.Y.S.2d at 235. The Court, thus, refused to recognize the tort of abusive or wrongful discharge of an at-will employee. *Id.; see also Gorrill v. Icelandair/Fluglei-dir*, 761 F.2d 847, 851 (2d Cir.1985); *Mounayer v. Brown & Williamson Tobacco Corp.*, 89 Civ. 7476, 1990 WL 129484, 1990

---

**5.** The Court recognizes that the Second Circuit has held that the publication requirement may be satisfied if the employee shows that the stigmatizing material was placed in her personnel file and that prospective employers are likely to gain access to it. *Brandt*, 820 F.2d at 45; *Velger v. Cawley*, 525 F.2d 334, 336 (2d Cir.1975), *rev'd*

on other grounds, *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). In the present case, however, plaintiff does not allege that any prospective employer has even attempted to gain access to her file, if it still exists, in the more than five years that have elapsed since the performance evaluations were prepared.

U.S. Dist. LEXIS 6285, 5 BNA IER Cas. 892 (S.D.N.Y. May 24, 1990).[6]

In addition, the *Murphy* Court also held that, in light of its holding "that there is now no cause of action in tort in New York for abusive or wrongful discharge of an at-will employee, plaintiff should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress." *Murphy*, 58 N.Y.2d at 303, 461 N.Y.S.2d at 236. The Court then reached the same conclusion with respect to a claim of prima facie tort. 58 N.Y.2d at 304, 461 N.Y.S.2d at 237. *See also Mounayer*, at p. 11; *D'Avino v. Trachtenburg*, 149 A.D.2d 401, 539 N.Y.S.2d 755, 757 (2d Dep't), *app. denied*, 74 N.Y.2d 611, 546 N.Y.S.2d 556, 545 N.E.2d 870 (1989).

■ Moreover, even assuming that plaintiff's intentional infliction of emotional distress and prima facie tort claims are not foreclosed by *Murphy*, plaintiff has failed to satisfy the elements of these claims. For instance, the tort of intentional infliction of emotional distress "predicates liability on the basis of extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349 (1985), *citing, Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978). Under the facts as alleged by plaintiff, defendants' conduct falls far short of meeting the above standard.

■ Prima facie tort permits recovery for the intentional infliction of harm, without any excuse or justification, by an act or series of acts which would otherwise be lawful. *Freihofer*, 65 N.Y.2d at 142–43,

490 N.Y.S.2d at 741, 480 N.E.2d at 355; *Backus v. Planned Parenthood of Finger Lakes*, 161 A.D.2d 1116, 555 N.Y.S.2d 494, 495 (4th Dep't 1990); *Dalton v. Union Bank of Switzerland*, 134 A.D.2d 174, 520 N.Y.S.2d 764, 767 (1st Dep't 1987). In addition, "[a] critical element of the cause of action is that plaintiff suffered specific and measurable loss, which requires an allegation of special damages." *Freihofer*, 65 N.Y.2d at 143, 490 N.Y.S.2d at 741, 480 N.E.2d at 355. In the present action, even assuming that defendants' sole motivation in terminating plaintiff was "disinterested malevolence," *Backus*, 555 N.Y.S.2d at 495, Dr. Piesco's prima facie tort claim must be dismissed since "no special damages are alleged and apparently none exist." *Freihofer*, 65 N.Y.2d at 143, 490 N.Y.S.2d at 741, 480 N.E.2d at 355; *see also Loudon v. Hayek*, 89 Civ. 1726, 1989 U.S. Dist. LEXIS 11263 (S.D.N.Y. Sept. 22, 1989); *Dalton*, 520 N.Y.S.2d at 767; *Alexander & Alexander, Inc. v. Fritzen*, 114 A.D.2d 814, 495 N.Y.S.2d 386, 389 (1st Dep't 1985).

## CONCLUSION

For the reasons expressed above, defendants' motion for summary judgment is granted in its entirety. Accordingly, each and every cause of action is dismissed as against each defendant.

---

**6.** The Court of Appeals in *Murphy* also reaffirmed that an employer could not terminate its employee based on a "constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment." 58 N.Y.2d at 305, 461 N.Y.S.2d at 237. Here, the Court has already decided that plaintiff's termination was not for a constitutionally impermissible purpose or in violation of a statutory proscription. In addition, the record is devoid of any evidence that plaintiff was employed pursuant to a contract which precluded his termination under the circumstances of this or any case.